**George Edward McFARLAND, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 71557.

Court of Criminal Appeals of Texas, En Banc.

Feb. 21, 1996.

Rehearing Denied June 19, 1996.

Marcelyn Curry, Houston, for appellant.

Alan Curry, Assist. Dist. Atty., Robert A. Huttash, Houston, State's Atty., Austin, for the State.

## OPINION

PER CURIAM.

Appellant was convicted of the offense of capital murder, specifically murder in the course of a robbery. V.T.C.A.Penal Code, § 19.03(a)(2). The jury answered the special issues prescribed by Article 37.071 § 2(b)(1)

and (2), V.A.C.C.P.[1] affirmatively and answered negatively the special issue prescribed by Article 37.071 § 2(e). Punishment was assessed accordingly at death. Appeal to this Court is automatic. Article 37.071 § 2(h). Appellant raises thirty-four points of error in his original brief and thirty-five points of error in a supplemental brief. We will affirm.

### Sufficiency of the Evidence

In his first point of error, appellant contends that the evidence is insufficient to establish his guilt. Appellant asserts that the State failed to prove beyond a reasonable doubt that he caused the death of Kenneth Kwan because other parties were involved in the crime.

The evidence at trial established the following: At approximately 12:30 p.m. on Friday, November 15, 1991, Kwan and a security guard, James Powell, were returning to Kwan's grocery store after going to the bank to obtain $27,000 to cash his customers' payroll checks. Upon arrival, Kwan and Powell, armed with a shotgun, exited Kwan's vehicle and proceeded toward the store. Carolyn Bartie, a regular customer, then pulled into the parking lot and Kwan waved.

Bartie testified that when she parked her car she noticed a black man, appellant,[2] kneeling on the ground between the grocery store and the adjacent laundromat. Appellant had a bag. When Kwan waved, Bartie noticed appellant get up and walk in front of her car toward Kwan. She looked down at her purse, then heard a "popping sound." When she looked up, appellant had Powell by the neck and was firing into the doors of the store. Another black man then came from behind appellant and ran in a ducking position into the store and soon came back out.

Powell testified that he also noticed a black man sitting along some rails beside the store with what looked like a bag of leaves. The man had his hand on top of the bag and a couple of towels on top of his hand. He surmised that the man had come from the laundromat next door. However, when the man jumped up and began coming towards him, Powell sensed something was wrong. Kwan began to run for the door of the store and Powell testified he lost eye contact with the man holding the bag. Suddenly, Powell felt a "gun up side [his] head." The man told Powell, "Drop the gun. Drop the gun. If you don't, I'll blow your God-damned brains out." Powell complied.

Powell next heard two shots fired from behind him, so he dropped to the ground. Powell testified that the shots were fired at Kwan as Kwan was trying to enter the store. He further testified that the man with the gun said nothing to Kwan before shooting him. Kwan was only fifteen to twenty feet away. Powell stated he heard approximately two shots inside the store and someone yell, "Get the bag, get the bag." Bartie testified that appellant was the one that yelled "get the bag."

Lupe Jiminez, a customer in the store, testified that he too heard a "popping sound" and then Kwan burst into the store. Immediately behind Kwan, Jiminez saw a tall black man in a ski mask follow Kwan into the store and shoot Kwan in the back. Larry Davis, another customer, testified that the man in the ski mask shot Kwan twice with a revolver. Both Jiminez and Davis ran to the back storage room to get out of the way. Mrs. Kwan, who was working at the cash register, witnessed her husband fall to the floor and saw the man who had entered the store take the money bag from him and exit the store. Powell testified that he observed the men drive off quickly in a grey Suburban. The Suburban was later determined to have been stolen.

Dr. Eduardo Bellas, Harris County Assistant Medical Examiner, performed the autopsy. Bellas testified that Kwan had five gunshot wounds, three of which he considered fatal. The fatal wounds consisted of two wounds in the right side of Kwan's back and one wound in the front chest. The other two wounds were merely grazing wounds to his

---

1. Unless otherwise indicated, all references to articles are to those in the Texas Code of Criminal Procedure.

2. Bartie positively identified appellant in open court and, also, during both a photo spread and police line-up.

right arm. Bellas testified that the wounds could have been caused by .38–caliber bullets. Donald Davis, a firearms examiner, testified that the bullets recovered from the victim and the scene were fired from either a .38 or .357–caliber gun. There was no evidence that the bullets were fired from the same gun.

Four days after the instant offense, Craig Burks, appellant's nephew, phoned Crime Stoppers with information pertaining to the crime.[3] Burks stated that appellant, Albert Harris, and Michael Clark were each involved in the robbery.

At trial, Burks testified that while riding around with Clark two weeks before the robbery, Clark pointed out Kwan's grocery store as they drove past. Clark told Burks that "he was going to retire from armed robbery and then the Chinese guy [sic] supposed to bring him a bunch of money[.]" Burks did not hear of the store again until he saw a news report the day of the offense. Later, on the day of the robbery, appellant came by Burks' house. Appellant had a new car and took Burks, Burks' brother Cedric, and Burks' uncle Walter for a ride and bought them all beer. Burks testified that, while driving, appellant talked about how he "robbed the Chinese guy. He pulled a pistol on a security guard and shot the dude, the Chinese guy." Burks further testified that appellant said that he had dressed like a bum for the crime and that Michael Clark, Albert Harris, and somebody named Marty were also involved. Appellant claimed they got $50,000 in the robbery and Burks noted appellant had a "bundle of money" with him in the car. Burks also testified that appellant changed his story and said that Albert Harris was the only one to fire a gun.

■ In order to support a guilty verdict, the State must prove the elements of the offense as set forth in the jury charge. *Rabbani v. State*, 847 S.W.2d 555, 558 (Tex.Cr. App.1992), *cert. denied*, 509 U.S. 926, 113 S.Ct. 3047, 125 L.Ed.2d 731 (1993); *Rivera v. State*, 808 S.W.2d 80, 91 (Tex.Cr.App.), *cert. denied*, 502 U.S. 902, 112 S.Ct. 279, 116 L.Ed.2d 231 (1991). The charge in this case authorized conviction of capital murder as follows:

Now, if you find from the evidence beyond a reasonable doubt that on or about the 15th day of November, 1991, in Harris County, Texas, the [defendant] did then and there unlawfully while in the course of committing or attempting to commit the aggravated robbery of [Kwan], intentionally cause the death of [Kwan], by shooting [Kwan] with a deadly weapon, namely, a firearm; or if you find from the evidence beyond a reasonable doubt that on or about the 15th day of November, 1991, in Harris County, Texas, Albert Harris and/or Michael Clark and/or Marty did then and there unlawfully while in the course of committing or attempting to commit the aggravated robbery of [Kwan], intentionally cause the death of [Kwan] by shooting [Kwan] with a deadly weapon, namely, a firearm, and that the [defendant], with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Albert Harris and/or Michael Clark and/or Marty to commit the offense, if he did, then you will find the defendant guilty of capital murder as charged in the indictment.

In reviewing a sufficiency question, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Gribble v. State*, 808 S.W.2d 65, 73 (1990), *cert. denied*, 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991).

■ Without citing any authority and ignoring the standard of review, appellant claims the evidence is insufficient because: (1) Bartie and Powell did not always have constant views of what was happening; (2) Bartie stated at the scene that she was not sure if she would be able to identify the perpetrators; (3) when Bartie identified appellant in a photo-spread, she stated she would also like to see him in a live line-up to be 100–percent sure; (4) neither Jiminez nor

---

**3.** Burks received $900 for the information leading to appellant's arrest.

Davis saw appellant shoot Kwan; (5) if the man holding Powell fired at Kwan as he ran in the door, the man in the ski mask surely would have been shot, and therefore appellant could not have shot at Kwan; and (6) Burks was not a credible witness.[4]

We first note that the jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony.[5] *Lafoon v. State,* 543 S.W.2d 617, 620 (Tex.Cr.App.1976). Second, we also note that proof beyond a reasonable doubt that appellant fired the fatal shot is not necessary for a capital murder conviction where the jury is charged on the law of parties. *Rabbani,* 847 S.W.2d at 558. In the instant case, an eye-witness testified that appellant participated in the crime and, in fact, fired shots at Kwan as he tried to enter the store. Further, appellant's admissions to his nephew that same evening following the crime establish that he was, at a minimum, a party to the offense. Therefore, viewing the evidence in the light most favorable to the verdict, we conclude that there was sufficient evidence for any rational trier of fact to conclude beyond a reasonable doubt that appellant was guilty of capital murder. Point of error one is overruled.

Appellant's twenty-ninth supplemental point of error contends that the evidence was insufficient to make an affirmative find-ing that he would be a future danger. Article 37.071 § 2(b)(1). We disagree.[6]

In reviewing the sufficiency of the evidence at the punishment phase, we again view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could make the finding beyond a reasonable doubt. *See Stoker v. State,* 788 S.W.2d 1, 7 (Tex.Cr.App.1989), *cert. denied,* 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990). The burden was on the State to prove the first two punishment issues beyond a reasonable doubt. Article 37.071 § 2(c). A jury is permitted to consider a variety of factors when determining whether a defendant will pose a continuing threat to society. *See Keeton v. State,* 724 S.W.2d 58, 61 (Tex.Cr.App.1987).[7]

At the punishment phase of trial, the State introduced evidence of various extraneous offenses. Appellant was convicted of the following: (1) on May 5, 1981, appellant and an accomplice robbed a Gordon's Jewelers at gunpoint (aggravated robbery); (2) on September 7, 1984, appellant and an accomplice hit a sixty-year old man on the head, stole a bank bag from him containing $2,400, and then tried to flee from the police (theft); and (3) on June 17, 1987, appellant attempted to evade arrest after being discovered with a stolen vehicle (evading arrest). The State

---

4. Appellant also contends, again without authority, that Burks' testimony is not credible because he was an accomplice as a matter of law, and, therefore, his testimony would need to be corroborated. Despite appellant's protestations otherwise, Burks was not an accomplice as a matter of law or fact. *See* point of error nineteen, *post.*

5. Appellant presents various arguments regarding inconsistencies in the testimony and credibility of witnesses due to their lines of vision; such arguments are inappropriate on appeal considering the standard of review explained above. *Burns v. State,* 761 S.W.2d 353, 356 (Tex.Cr.App. 1988).

6. In appellant's thirtieth supplemental point of error, he also contends that the "incomplete extra-statutory punishment charge on unadjudicated extraneous offenses requires reversal of appellant's [sentence] because there is no way for this Court to meaningfully review the sufficiency of evidence supporting the jury's answer to the 'future dangerousness' issue." Specifically, he be-

lieves the trial court was required to give a separate charge for each unadjudicated extraneous offense to require the jury to find he committed each extraneous offense beyond a reasonable doubt. Appellant requested no such instructions at trial. He fails to show egregious harm now under *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Cr.App.1984) (opinion on rehearing). This point of error is overruled.

7. Among those factors are: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the offense; (7) psychiatric evidence; and (8) character evidence. *Keeton,* 724 S.W.2d at 61.

also put on evidence regarding the following three unadjudicated offenses.

On September 6, 1991, two Wal–Mart employees were robbed when they returned to the store after going to the bank to make a deposit and obtain $5,000 in change. One of the victims, Frank Eppner, identified appellant as the man who held an uzi-machine gun to his head and demanded the money. Appellant made Eppner lay face down on the ground with his hands spread out while appellant held the gun on him and looked for the money. When appellant's accomplice had trouble with Richard Phillips, the other victim, appellant said, "Just shoot him, take the keys yourself. Just kill the man. Don't jack with him. Kill him." Appellant and his accomplice eventually took Eppner's truck and the money. They fled the scene without harming either victim. Phillips followed them in his car. At an intersection, the men stopped the truck, appellant got out, pointed his gun at Phillips, and fired a shot. Phillips got away unharmed. It was later determined that the vehicle appellant and his accomplice had used to get to the Wal–Mart was also stolen.

On September 8, 1991, appellant was arrested for an altercation in a night club parking lot. Appellant had been arguing with another customer and they were both asked to leave the club. A security guard noticed the men still in the club parking lot after closing. The men were in a shouting match. Appellant then went to a car, retrieved a gun, and put the gun to the other man's back. The security guard intervened and took the weapon. The gun was later determined to be loaded with hollow-point bullets. The security guard had to obtain help in order to place appellant under arrest.

Finally, on December 19, 1991, prior to appellant's arrest for the instant offense, he was seen exiting a stolen vehicle. Thus the record shows that appellant repeatedly exhibited and used deadly weapons during this and other offenses. Further, he exhibited a general disregard for human life by threatening to kill others during these offenses and by harming his victims on more than one occasion. Considering the record as a whole, we conclude there was ample evidence to support the jury's affirmative finding that there was a probability that appellant would be a continuing threat to society. Appellant's twenty-ninth supplemental point of error is overruled.

 In supplemental point of error fifteen, appellant contends that the evidence is insufficient to support the jury's negative answer to the mitigation question.[8] He urges this Court to limit its sufficiency review to the mitigating factors and exclude consideration of the aggravating factors. Further, supplemental point eighteen avers that this Court should engage in a proportionality review of the sufficiency of mitigating evidence: weigh the aggravating evidence against the mitigating evidence.

 This Court has previously held:

In Texas, this mitigating evidence is admissible at the punishment phase of a capital murder trial. Once admitted, the jury may then give it weight, if in their individual minds it is appropriate, when answering the questions which determine sentence. However, "[t]he amount of weight that the factfinder might give any particular piece of mitigating evidence is left to 'the range of judgment and discretion' exercised by each juror.'"

*Banda v. State,* 890 S.W.2d 42, 54 (Tex.Cr. App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2253, 132 L.Ed.2d 260 (1995); *Johnson v. State,* 773 S.W.2d 322, 331 (Tex.Cr.App. 1989), *affirmed in part, Johnson v. Texas,* 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993). Currently, the Texas legislature has not clearly assigned a burden to either the State or the defendant to disprove or prove the mitigating evidence.[9] *Barnes v. State,*

---

8. Appellant actually says "affirmative" answer, but we will assume that he meant "negative." Under the 1991 changes to Article 37.071, it is a *negative* answer to the mitigation question that leads to the imposition of the death sentence.

9. Because appellant is the beneficiary of mitigating evidence, the burden of production should fall to him. *See Arnold v. State,* 786 S.W.2d 295, 298 (Tex.Cr.App.), *cert. denied,* 498 U.S. 838, 111 S.Ct. 110, 112 L.Ed.2d 80 (1990) (State has burden of proof to establish harmless error under

876 S.W.2d 316, 330 (Tex.Cr.App.), *cert. denied,* — U.S. —, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994). Unlike a particular offense or defense defined in the Texas Penal Code which contains specific elements that must be met, "mitigating evidence" is not specifically defined. Instead it is left to each individual juror's own determination. In fact, Article 37.071 § 2(f)(4) defines "mitigating evidence" to be "evidence *that a juror might regard* as reducing the defendant's moral blameworthiness." (Emphasis provided).[10] There is no *per se* evidence that must be viewed by a juror as having definitive mitigating effect. Because the weighing of "mitigating evidence" is a subjective determination undertaken by each individual juror, we decline to review that evidence for "sufficiency." We defer to the jury's conclusion that the evidence did not warrant a sentence of life imprisonment. Supplemental points of error fifteen and eighteen are overruled.

Conversely, in supplemental points sixteen and seventeen, appellant agrees that a meaningful appellate review of the sufficiency of mitigating evidence is impossible, but he contends such review is required. He argues that Article 44.251(a) *requires* review of Article 37.071 § 2(e). He concludes that because the mitigation special issue precludes a meaningful review, the Texas death penalty scheme is unconstitutional.

We first note that meaningful review of the jury's verdict by which the penalty of death is assessed is not wholly precluded. This Court does review the sufficiency of the future dangerousness issue. *See Keeton, supra.* As stated previously, the mitigation issue is a vehicle provided to take into account jurors' individual views and allows them to choose a life sentence if they feel it is warranted. The jury does not reach the mitigation issue unless it has already found that the defendant will be a future danger. Article 37.071 § 2(e). While this Court can review objective evidence of future dangerousness, we cannot meaningfully review the jury's normative decision on mitigation, whether it answers in the affirmative or the negative.

Next, appellant contends Article 44.251(a) requires a sufficiency review. Article 44.251(a) states:

> (a) The court of criminal appeals shall reform a sentence of death to a sentence of confinement in the institutional division of the Texas Department of Criminal Justice for life if the court finds that there is insufficient evidence to support an affirmative answer to an issue submitted to the jury under Article 37.071(b) of this code or a negative answer to an issue submitted to a jury under Article 37.071(e) of this code.[11]

On its face this provision does indeed mandate a reformation of sentence from death to life "if" the evidence is not "sufficient" to support a negative answer to the mitigation issue.

██ In construing a statute, we look first to the literal language, for that is the best indicator of the legislative intent. *Boykin v. State,* 818 S.W.2d 782 (Tex.Cr.App.1991). In this case, however, we cannot take the statute to mean what it plainly says. A genuine

---

Tex.R.App.Proc. 81(b)(2), as beneficiary of the error); *see also Barnes,* 876 S.W.2d at 330 n. 17. Therefore, if the jury verdict is against him, appellant can only argue that the verdict was against the great weight and preponderance of the evidence. *Cf. Meraz v. State,* 785 S.W.2d 146, 155 (Tex.Cr.App.1990) (defendant has burden to prove affirmative defense of insanity and appellate review should inquire whether the evidence was against the great weight and preponderance of the evidence). Appellant does not make that argument here.

**10.** The Supreme Court has also held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is not constitutionally required. *Franklin v. Ly-*

*naugh,* 487 U.S. 164, 179, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988) (Plurality opinion). Additionally, the Court has held that the Eighth Amendment also does not require a State to ascribe any specific weight to any particular factors to be considered by the jury, either aggravating or mitigating. *Harris v. Alabama,* — U.S. —, —, 115 S.Ct. 1031, 1035, 130 L.Ed.2d 1004 (1995). It follows that the Texas scheme which allows the jury to determine the weight of mitigating evidence is not unconstitutional.

**11.** Obviously the legislature intended Article "37.071(b)," to refer to Article "37.071 § 2(b)(1)," the question on future dangerousness, and Article "37.071(e)" to reference Article "37.071 § 2(e)," the mitigation issue.

"sufficiency" review of the jury's negative answer to Article 37.071 § 2(e) is a logical absurdity. Because the burden of production (if not persuasion) under Article 37.071, § 2(e) is on the defendant, he can only argue that the jury's negative answer was against the great weight and preponderance of the evidence—*not* that the evidence was "insufficient" to support it. *See* n. 9, *ante*. Thus, if we hold Article 44.251(a) to its literal terms, this Court by definition will never reform a sentence of death to life on account of "insufficiency" of the evidence to support a negative finding on mitigation.

In order to give Article 44.251(a) effect, we could interpret it to mandate reformation to life upon a finding that the jury's negative answer was against the great weight and preponderance of the evidence. But as we have already shown, Article 37.071 § 2(f)(4) assigns to the jury the task of evaluating what evidence proffered in mitigation is "sufficient" to warrant a life sentence. We cannot say that evidence is mitigating as a matter of law any more than we can say, in a non-capital case, that the evidence is insufficient to support a twenty year sentence, or that the great weight and preponderance of the evidence establishes that the proper sentence would have been ten years, probated. There is simply no way for an appellate court to review the jury's normative judgment that the evidence did or did not warrant a life sentence.

There is one other alternative. We could construe Article 44.251(a) to mandate that this Court conduct an independent, *de novo* review of the mitigating evidence, and decide according to our own lights whether Article 37.071 § 2(e) ought to be answered in the affirmative. We think it highly unlikely, however, that this construction would jibe with the Legislature's intent. Such a scheme would effectively render the jury's answer to the § 2(e) special issue merely advisory. While that would undoubtedly withstand Eighth Amendment scrutiny, it would constitute a radical departure from our ordinary jury-deferring routine in reviewing the "sufficiency" of special issues at the punishment phase of a capital murder trial. *See Burns v. State,* 761 S.W.2d at 355–356 & n. 4. Presuming the Legislature to be cognizant of this Court's prior caselaw, we would hardly expect it to mandate a "sufficiency" review if by that it meant this Court should re-evaluate and reweigh the same evidence the jury has already heard.

In any event, we do not believe constitutionality of Article 37.071 is contingent upon appellate review of the mitigation issue, whatever form that review takes. So long as the jury is not precluded from hearing and effectuating mitigating evidence, we have never regarded appellate review of mitigating evidence to be an essential component of a constitutionally acceptable capital punishment scheme. Indeed, in *Burns* we "abandoned any pretense" of balancing mitigating evidence against aggravating evidence as a matter of appellate review of the punishment issues then extant. We cited *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) for the proposition that "it is doubtful [that] Eighth Amendment or Due Process considerations absolutely require this Court to reweigh punishment evidence...." *Id.,* at 356, n. 4. We now hold that appellate review of the jury's answer to the Article 37.071 § 2(e) special issue is not constitutionally required. Indeed, as we have shown, it is a practical impossibility. Supplemental points sixteen and seventeen are overruled.

### Ineffective Assistance of Counsel

In points of error two through fourteen, appellant argues that he was rendered ineffective assistance of counsel. He points to various individual examples of deficiencies in his counsel's performance to prove that the representation by trial counsel fell below an objective standard of reasonableness and was prejudicial. He then argues that the totality of the incidents prejudiced him to such a degree that he was denied a fair trial. After a careful review of the record, and considering the strict standards for determining that counsel was ineffective, we cannot say appellant was rendered ineffective assistance.

The standard for testing claims of ineffective assistance of counsel was announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674

(1984).[12] In *Strickland,* the Supreme Court admonished that a claimant must prove that counsel's representation so undermined the "proper functioning of the adversarial process that the trial cannot be relied on having produced a just result." *Id.* at 686, 104 S.Ct. at 2064. Appellant must prove: (1) that his counsel's representation was deficient; and (2) that the deficient performance was so serious that it prejudiced his defense. *Id.* at 687, 104 S.Ct. at 2064. This means appellant must prove by a preponderance of the evidence that counsel's representation fell below the standard of prevailing professional norms, and that there is a reasonable probability that but for counsel's deficiency the result of the trial would have been different. *McFarland v. State,* 845 S.W.2d 824, 842 (Tex.Cr.App.1992), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993).

■■■■ The review of counsel's representation is highly deferential; we indulge a strong presumption that counsel's conduct falls within a wide range of reasonable representation. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. The burden is on appellant to overcome that presumption. *Id.* Appellant "must identify the acts or omissions of counsel that are alleged" to constitute ineffective assistance and affirmatively prove that they fall below the professional norm for reasonableness. *Id.* at 690, 104 S.Ct. at 2065–66. After proving error, appellant must *affirmatively prove prejudice. Id.* at 693, 104 S.Ct. at 2067–68. Appellant must prove that counsel's errors, judged by the totality of the representation, not by isolated instances of error or by only a portion of trial, denied him a fair trial. *Id.* at 695, 104 S.Ct. at 2068–69; *McFarland,* 845 S.W.2d at 843. It is not enough for appellant to show that the errors had some conceivable effect on the outcome of the proceedings. *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067–68. He must show that there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt respecting guilt and/or the sentence of death. *Id.* at 695, 104 S.Ct. at 2068–69. In reviewing this determi-

nation, we consider the totality of the evidence before the jury. *Id.* Any allegation of ineffectiveness must be firmly founded in the record and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Cruz,* 739 S.W.2d 53, 59 (Tex.Cr.App. 1987). Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *Id.* at 700, 104 S.Ct. at 2071.

### 1. Trial Preparation

■■■ In his second point of error, appellant contends that his attorneys did not adequately prepare before trial. In point of error three, he argues that counsel did not confer with him in a manner consistent with the gravity of a capital case. And, in his fourth point of error, he complains that none of his requested witnesses were questioned or subpoenaed.

Appellant first focuses his attention on the fact that attorney Benn did not file any motions or subpoena any witnesses. We note that appellant fails to take into account that he was represented by two attorneys, Benn and Melamed. Melamed filed numerous motions with the trial court. In addition, Melamed testified at the motion for new trial hearing that he felt it was his position "to be prepared to do everything" and that he was prepared to do the entire trial, although he did obtain both appellant's and Benn's consent on various matters. Appellant fails to show whether Melamed did or did not subpoena any witnesses.[13] However, we note that three defense witnesses were called at punishment. Benn also testified that he believed Melamed was a capable co-counsel and that he relied on Melamed to subpoena any witnesses.

Appellant specifically complains that his counsel failed to subpoena Walter Burks, Ricky Payton, James Pritchett, and Wilbert Bonaparte. At the motion for new trial hearing, Melamed testified that he and appellant discussed which witnesses should be called.

---

12. Texas adopted the *Strickland* two-prong test for purposes of state constitutional analysis in *Hernandez v. State,* 726 S.W.2d 53, 57 (Tex.Cr. App.1986).

13. The record is devoid of evidence of any requests for subpoenas.

Appellant gave him no names to assist in the guilt/innocence phase of trial. Some of the witnesses appellant discussed for punishment could not be located. Melamed also stated that he and appellant agreed not to call the other potential witnesses. Further, as to Walter Burks, Melamed testified that when he and appellant discussed family members testifying as to the mental state of Craig Burks, they decided not to call certain relatives because of a family conflict. Walter Burks is Craig Burks' uncle and appellant's brother-in-law. At the hearing, Melamed could not remember whether or not Walter was one of the family members that appellant did not want to call. Melamed did testify that appellant specifically stated that he did not want his former attorney, Richard Frankoff, subpoenaed to discuss the unadjudicated aggravated robbery offense. Benn testified that appellant participated in the decisions regarding whether or not a witness should be subpoenaed. *See McFarland*, 845 S.W.2d at 848 (When defendant preempts attorney's strategy by insisting certain evidence be put on or kept out, no claim of ineffectiveness can be sustained). Benn also testified that they did not call any witnesses that they believed would testify in a manner adverse to appellant's case.[14]

▮▮▮ Appellant next claims that Benn and Melamed failed to question any witnesses prior to trial and did not go to the scene of either the capital murder or the extraneous aggravated robbery, relying solely on the contents of the State's file for their investigation. As we observed in *Ex parte Duffy*, 607 S.W.2d 507, 516 (Tex.Cr.App. 1980) (Plurality opinion), "counsel is charged with making an *independent* investigation of the facts of the case[.]" Ordinarily counsel should not blindly rely on the veracity either of his client's version of the facts or witness statements in the State's file. *Id.* But this duty to investigate, at least since *Strickland* was decided, is not categorical. Rather,

"counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Such a decision not to investigate "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* In any event, we will not reverse a conviction unless the consequence of the failure to investigate "is that the only viable defense available to the accused is not advanced[,]" *Ex parte Duffy*, supra, at 517, and "there is a reasonable probability that, but for counsel's [failure to advance the defense], the result of the proceeding would have been different." *Strickland*, supra, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

The record shows that the attorneys, at a minimum, discussed the case with appellant and went over the State's witnesses' statements. Counsel decided that further interviews were unnecessary. There is no indication that any new or helpful information would have been acquired or that this decision in any way limited or impeded appellant's defense. *See Wilkerson v. State*, 726 S.W.2d 542, 550 (Tex.Cr.App.1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987). As for counsels' failure to visit the scene of the capital murder and the extraneous robbery, these deficiencies are not alone sufficient to amount to ineffective counsel under *Strickland*. Both attorneys testified that they reviewed the State's files regarding both offenses. The record reveals, at least for the capital crime, that counsel had access to a crime scene video, numerous photos, and witness statements. Counsel further discussed the case with appellant. There is nothing in the record to show that potential defenses were precluded or that a visit to either scene would have made any difference in appellant's defense.[15]

---

14. Appellant makes many comments about how at the motion for new trial hearing Benn and Melamed could not always recall from memory who the various witnesses were that appellant had asked them to call. We do not see how this is relevant to counsels' representation at the time of trial.

15. We further note that appellant failed to elicit whether the investigator hired by defense counsel visited the scene of the capital crime or questioned any witnesses. Contrary to appellant's conclusory statement that the investigator investigated nothing, Melamed only testified that the investigator did not work on the extraneous offenses.

Appellant fails to satisfy, if not the deficiency prong of *Strickland, see Wilkerson,* supra, then the prejudice prong; he cannot show a reasonable probability that had counsel independently investigated, the result of the proceeding would have been different.

Appellant further makes various conclusory accusations about his counsel. He claims that Melamed did not view the video line-up until the identification-suppression hearing. The record does not support this statement. Melamed merely testified that "there was indeed a video lineup and, I believe, a hearing prior to trial to suppress the identification" as based upon the line-up. We cannot and do not glean from these statements that Melamed had never before viewed the video. Next, he insists that neither counsel knew that Richard Phillips had not identified appellant in the Wal-mart robbery or that Frank Eppner had some doubt that appellant was the robber. Again, appellant misinterprets the record. In both cases, the information was elicited from the witness and appellant's counsel confirmed it for the jury during cross-examination. No evidence appears that appellant's counsel was unaware of the information prior to the witnesses testifying. Finally, he asserts that his counsel never viewed the arrest warrant, probable cause affidavit, or photo spread from the Wal-mart robbery. Appellant fails to support this claim with any record evidence. Merely because counsel cannot recall whether he viewed this evidence does not conclusively prove that he did not. These complaints have no merit.

Appellant next focuses on the number of times that Melamed spoke with appellant.

However, appellant himself testified at the motion for new trial hearing that he and Melamed discussed the capital crime and the extraneous offenses. He also testified that he talked to Melamed every day during jury selection. Melamed testified that he met with appellant for several hours at the jail, spoke to him several times at the courthouse, and spoke with him several times on the phone. We fail to see the inadequacy of Melamed's meeting times. Appellant cites no authority to give us guidance.[16]

Appellant also points to the fact that when Melamed went to the jail to speak with him, Melamed only took notes on appellant's personal life. However, as Melamed explains, he was taking notes on any possible mitigating evidence that could be helpful at punishment. We will not fault counsel for attempting to develop strategy to be used at trial. And, again, appellant does not cite us to any authority to support his position that Melamed's particular note-taking habits rendered his performance inadequate.

Lastly, appellant argues that counsel did not confer with each other enough and did not discuss which attorney would question each witness. Appellant fails to explain why or how the number of meetings between his counsel was detrimental to him. Further, regarding the witnesses, appellant points to nothing in the record to show that counsel was unprepared during questioning.[17]

Viewing the circumstances as a whole, we hold that appellant fails to meet the first prong of the *Strickland* test in any of the above arguments. Accordingly, trial counsel's preparation for trial did not fall below

---

**16.** Appellant mentions in one sentence that Benn only talked to appellant in court and on the telephone. Appellant makes no other argument pertaining to Benn's representation in this area.

**17.** Appellant cites to the following testimony by Melamed as the only evidence that Melamed was unprepared:

> Before each witness I would ask Mr. Benn whether or not he wanted to take them or whether he wanted me to. There were several witnesses where Mr. Benn—State's witnesses where Mr. Benn initially said he was going to take them and subsequently after their testimony he told me to take them on cross. At the latter parts of the trial, I think I did all the witnesses on the innocence-guilt portion ex-

cept one eyeball witness which Mr. Benn told me ahead of time that he wanted to cross-examine the lady.

However, appellant failed to cite the rest of Melamed's testimony on the subject:

> [State]: So, you were prepared to handle the cross-examination of any witness the State presented?
> [Melamed]: I prepared as if I was going to do the whole trial. I was not sure of what Mr. Benn was going to do or wanted me to do.

The record does not support appellant's inference. Appellant further attacks the adequacy of Benn's cross-examination of Carolyn Bartie, but fails to cite us to any portion of the questioning.

the objective standard. Points of error two, three and four are overruled.

## 2. Voir Dire

In his fifth point of error, appellant claims that he was denied effective assistance of counsel because Benn only asked a limited number of questions of the jurors selected during voir dire. Appellant cites the Court to Benn's questioning of each of the jurors. However, with the exception of Scott, Petter and Taylor, he fails to explain in any manner why these jurors were objectionable or why further questioning might have been in order. Therefore, we will only address appellant's complaints concerning Benn's questioning of these three jurors.

█ In reference to juror Scott, appellant points to a portion of her testimony that he finds troublesome:

> [State]: Do you feel like you would have any problems working with 11 other citizens to make the decision in such a way that you would know that the Defendant would get the death penalty?
>
> A. No, because no matter how I felt, I would want to make sure that he did get all the right benefits. Just because I feel one way, that's what the jury is for. We can talk about it and decide what punishment that he should get, and a lot of times, you can see things a little bit clearer when you have 11 other people that are discussing it with you and pointing out different factors. But I don't think I would have a problem even voicing my opinion with 11 more people.

Appellant asserts that Scott considers the death penalty to be a "benefit," and, presumably, would therefore always vote for the death penalty. This is not the only, or even the likely, import of Scott's testimony. From her surrounding statements, it is apparent that Scott meant that she would give appellant all of his "constitutional benefits." We cannot rule out that Benn also interpreted Scott's testimony in this way. Because Scott would not be challengeable for cause on this statement, appellant does not show that Benn's representation was deficient.

For juror Petter, appellant again misconstrues the likely gist of the testimony in order to argue that the juror "has extreme belief in the extensive use of the death penalty." Appellant believes the following testimony should have caused Benn concern:

> [State]: You say the *Silence of the Lambs* was the last movie you saw. Certainly, there was an individual in there—I haven't seen the movie—but I understand that there is an individual in there that might be strongly considered for the death penalty?
>
> A. There was more than one.

Appellant contends that any "competent" attorney would question Petter regarding his belief in the death penalty. However, he ignores all Petter's other responses regarding the death penalty, including: "Sometimes I think life imprisonment can be more effective than the death penalty, depending on the individual circumstances." Petter further stated that he believed some people can be rehabilitated and that he would consider all mitigating circumstances. We do not believe that appellant has shown that Benn's performance was deficient in failing to question Petter further on this issue; nor do we find that appellant proves that Petter would have been challengeable for cause in any way.

█ Next, appellant claims juror Taylor was biased against him and that Benn was ineffective because he failed to question her about her brother's murder six years earlier. Appellant particularly points to the fact that Taylor agreed on the prospective jurors' questionnaire that, "I am strongly in favor of capital punishment as an appropriate penalty." He also notes that she stated, "I don't think that I can be fair to the Defendant with my judgment ... I just don't think I would be able to sit through a murder trial, knowing my brother had, at one time, been killed and I had gone through this once before ... I think I might be too harsh in my opinion." However, appellant again fails to view the juror's testimony as a whole. Taylor stated that she would be able to put aside what she had been through and listen to the evidence in the instant case. She also stated that she would be able to be fair to appellant and hold the State to its burden of proof. She would

not find appellant guilty because of her past experiences. Under the circumstances we will not second-guess counsel's arguably tactical decision not to question the juror in greater depth. Point of error five is overruled.

■ In point of error nine, appellant states that he was denied effective assistance of counsel because Melamed struck four prospective jurors before the State had finished questioning them and before he conducted his own voir dire. However, appellant merely speculates on the propriety of such a course of action, and provides no specifics as to why Melamed should not have struck these venirepersons. Appellant merely states that the strikes were not "intelligently" made.[18] He fails to meet the first prong of *Strickland*. Melamed was present at voir dire, listened to the answers of the venirepersons, and viewed their demeanor. We will not second-guess tactical trial decisions. Appellant's ninth point of error is overruled.

■ In appellant's tenth point of error, he contends that he was denied effective assistance of counsel because Melamed selected venirewoman Smart as a juror without asking her any questions about defense issues. Appellant specifically points to the fact that Melamed did not question Smart about the statement she made during the prosecutor's voir dire examination: "I think we have too many early parolees out on the street today." Again, appellant ignores the full record.

Smart testified that she would follow the law and instructions as set out by the trial court. She stated that she understood that she could not predict when appellant would get out of prison if the jury voted for a life sentence during the punishment stage. She further confirmed that she would not use her fear of parole in responding to the special issues and would hold the State to its burden

of proof. Moreover, appellant fails to show how questioning Smart on defense issues would have revealed a basis for a challenge for cause. Therefore, he has failed to meet his burden under either prong of the *Strickland* test. Point of error ten is overruled.

■ In his eleventh point, appellant contends that he was denied effective assistance of counsel because Melamed did not try to rehabilitate potential juror Flores after the State challenged her for cause. Flores testified repeatedly that she was morally opposed to the death penalty and that she would never answer the special issues in such a way that a death sentence would be assessed. We will not second-guess counsel's apparent decision that the venireman's views were probably so firmly held that an attempt at rehabilitation would not be worth the candle. Point of error eleven is overruled.

■ In point of error twelve, appellant contends that he received ineffective assistance of counsel because Melamed only requested one additional peremptory strike. He apparently believes that Melamed should have asked for more than one additional peremptory strike because Melamed argued that the trial court had erroneously denied four of his challenges for cause. The record shows that Melamed did ask the trial court for a second additional peremptory strike the next day, but the request was denied. However, following the denial of this request, appellant and the State accepted the twelfth and final juror without objection. Because appellant names no objectionable juror that he was forced to accept on the jury, he can show no harm. Thus, he does not meet the second prong of *Strickland*. Point of error twelve is overruled.

■ In his thirteenth point of error, appellant contends that he was denied effective assistance of counsel because his trial

18. We would disagree. Prospective juror Feltham testified that she was indispensable at her job because her boss was seriously ill and further testified that she was on daily medication for migraines. Prospective juror McCarty testified that he had been involved as a juror in two previous criminal cases—both of which had hung juries which frustrated him. Villareal testified that he used to be employed as a military police-

man and then as an officer with the Victoria Police Department. And, finally, prospective juror Eisenberg testified that her husband had been robbed and assaulted at his liquor store, she had been burglarized, and a friend of hers had also been recently victimized. Melamed could reasonably believe, even on this limited information, that each of these persons would not be a desirable juror for appellant's cause.

counsel was denied the right to voir dire potential jurors concerning their "specific knowledge" about the actual time served on a life sentence. Appellant maintains that he was denied effective assistance because the trial court prevented his counsel from asking a proper question. A proper question is one that seeks to discover a juror's views on an issue applicable to the case. *Nunfio v. State,* 808 S.W.2d 482, 484 (Tex.Cr.App.1991); *Woolridge v. State,* 827 S.W.2d 900, 904 (Tex. Cr.App.1992). But a capital jury is properly instructed to disregard the possibility of parole during deliberations. Actual time served on a life sentence is, therefore, not an issue in the case. *See Smith v. State,* 898 S.W.2d 838, 846–53 (Tex.Cr.App.), *cert. denied,* —— U.S. ——, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995). Melamed did all he could in attempting to ask the complained-of question regarding the jurors' beliefs about the actual time a defendant serves before his release on parole. Disallowing the question, however, did not amount to preventing counsel from asking a "proper" question. Because appellant cannot meet his burden under the first prong of *Strickland,* point of error thirteen is overruled.

■ Appellant's third supplemental point of error claims he was denied the effective assistance of counsel guaranteed under Article I, § 10 of the Texas Constitution, specifically during voir dire. He further posits that this Court should eliminate the "prejudice" prong of *Strickland.* Appellant cites us no authority explaining how or why the protections of the Texas Constitution are greater than those granted by the Sixth Amendment other than to say that we have done so in different contexts. This presents inadequate cause to abandon the two-prong test of *Strickland,* adopted by this Court in *Hernandez,* 726 S.W.2d at 57. *See* Tex.R.App. Proc. 74(f) (inadequately briefed). In any event, appellant fails to show deficient per-

formance on the part of counsel. Phrases like "woefully inadequate performance" and "lead counsel's extremely cursory questioning" are simply rhetorical; he provides no record cites showing where these alleged inadequacies took place. Further, appellant gives no specific examples of how additional questioning would have helped his case nor what extent of questioning during voir dire he would consider effective or satisfactory. Appellant does not meet either prong of *Strickland.* Supplemental point of error three is overruled.

### 3. Guilt/Innocence

■ Appellant contends in his sixth point of error that he received ineffective assistance of counsel because Benn slept through parts of the trial.[19] In support of his contention, appellant cites to *Javor v. U.S.,* 724 F.2d 831 (9th Cir.1984). In *Javor,* the Ninth Circuit found that because the defendant's counsel slept through substantial parts of the trial, he was denied his Sixth Amendment guarantee to effective assistance of counsel. *Id.* at 833–34. However, *Javor* is not controlling. There the court stated:

> Javor's Sixth Amendment right was violated not because of specific legal errors or omissions indicating incompetence, but because he had *no* legal assistance during a substantial portion of his trial.

724 F.2d at 833–34. Unlike *Javor,* appellant had two attorneys. Appellant was never without counsel. Additionally, Melamed stated at the motion for new trial hearing that he was prepared to do everything in the case. Although we do not condone Benn's behavior, viewing the totality of circumstances, appellant fails to make any showing that he was not effectively represented at trial by Melamed.[20] Therefore, because appellant has failed to show that he was prejudiced to the extent that the result of his trial would have

---

**19.** At the motion for new trial hearing, Benn testified: "I'm 72 years old. I customarily take a short nap in the afternoon." Melamed further noted that he did notice Benn sleep. Appellant, however, fails to bring forth evidence showing

when Benn slept, for how long, or if the jury took note of it.

**20.** We might also view Melamed's decision to allow Benn to sleep as a strategic move on his part. At the new trial hearing, Melamed stated

been different,[21] point of error six is overruled.

■ In point of error seven, appellant claims that he was denied effective assistance of counsel because Benn did not try to impeach the testimony of the "State's only eyewitness able to identify appellant," Carolyn Bartie, with her testimony from the hearing on the motion to suppress identification. Appellant then cites what he considers to be discrepancies in Bartie's testimony. First, he argues that Bartie's testimony varied in the description she gave of appellant. He contends that at the identification hearing she stated that appellant was wearing a striped shirt, but at trial she states he was wearing a black shirt. Appellant misinterprets the testimony. At the identification hearing the following transpired:

> [State]: Do you recall the man that was holding the security guard with the gun firing in the store, how was he dressed that day, if you remember?
>
> A. I think maybe a striped shirt, I think.

While at trial, the State elicited the following:

> Q. And could you give me a general description?
>
> A. Was it a man or a woman—
>
> Q. In black or white?
>
> A. Black.
>
> Q. Were you able to see his face where you were seated in your car?
>
> A. Yes.

The subject matter of the State's questioning was different in the instances cited us by appellant. In the former instance, the State was asking about appellant's clothing; in the latter, it appears the State was inquiring as to the perpetrator's physical characteristics. No discrepancy occurred in the testimony with which Benn could impeach Bartie.

Second, appellant contends that there is a discrepancy in Bartie's testimony as to whether she actually saw appellant fire the gun. However, appellant again misreads the record. Despite appellant's assertions to the contrary, at both the identification hearing and trial, Bartie testified that when she looked up after hearing the popping sounds she saw appellant holding the security guard and firing with his arm extended toward the store.

Finally, appellant recognizes that Bartie stated at the identification hearing that she had some doubt in her mind about identifying appellant after viewing the photo spread and that was why she wanted to see a lineup. However, he notes that at trial, although Bartie reiterated her hearing testimony, she also answered that she had positively identified appellant in the photo spread. First, we fail to see the discrepancy in Bartie's testimony because she did identify appellant in the photo spread and signed the back of the photo denoting such. Second, it would be acceptable trial strategy not to risk reinforcing the fact that, even if she was unsure of the photo, that she was absolutely sure that appellant was the perpetrator after the live line-up. Appellant fails to meet the first prong of the *Strickland* test by showing Benn's performance was ineffective. His seventh point of error is without merit and is overruled.

■ In his eighth point of error, appellant contends that he was denied effective assistance of counsel because Melamed did not elicit from Sergeant William Stephens that Bartie wished to see appellant in person before she was positive that he was the assailant. Appellant cites to the fact that at the identification hearing, Melamed elicited from Stephens that Bartie's identification of appellant was tentative and not one-hundred percent after viewing the photo spread. Appellant then notes that at trial Melamed failed to get Stephens to testify to this same information. However, Melamed may rationally have believed that if he were to elicit this information it would likely open the door to Stephen's characterization of Bartie's identi-

---

that he believed that the jury might have sympathy for appellant because of Benn's "naps."

**21.** Appellant argues that we should ignore the prejudice-prong of the *Strickland* test in this instance. *Strickland* states that in some instances. prejudice shall be presumed, such as the actual

or constructive denial of counsel *altogether.* 466 U.S. at 692, 104 S.Ct. at 2067 (Emphasis added). If appellant did not have co-counsel we might be inclined to agree. However, this is not the situation here.

fication of appellant as "strong tentative." Melamed had previously successfully objected to this characterization on State's direct. While appellant may feel in hindsight that this information may have been useful, Melamed's decision was within the wide range of professionally competent assistance. Point of error eight is overruled.

Finally, in his fourteenth point of error, appellant avers that the combination of errors he complains of in points two through thirteen manifests ineffective assistance of counsel. His argument is merely a reiteration of the preceding points of error. We have already addressed each of appellant's concerns. Without further argument or authority as to why the combination of these eleven points should create ineffective assistance, we hold instead, consistent with *Strickland*, that appellant has failed to meet his burden. Point of error fourteen is overruled.

### Right to Counsel

In supplemental points of error one and two, appellant claims that his Sixth Amendment right to counsel was violated. He asserts that he never waived his right to counsel and, therefore, the pre-trial line-up identification and resulting in-court identification were inadmissible. Evidence of each was admitted at trial.

The pertinent facts are as follows: On January 2, 1992, a Harris County judge issued a warrant for appellant's arrest. The next day, appellant was arrested. He then participated in a line-up where he was identified by a witness to the murder. Appellant alleges that he was required to participate in the line-up. The State maintains that he consented. There is also some dispute as to whether appellant signed a waiver-of-counsel form prior to the line-up. On January 4th, the State filed a complaint against appellant. He was taken before a magistrate on January 6th. An indictment was filed on March 27, 1992.

The Sixth Amendment right to counsel does not attach until the State begins adversarial judicial proceedings. *Kirby v. Illinois*, 406 U.S. 682, 688–90, 92 S.Ct.

1877, 1881–83, 32 L.Ed.2d 411 (1972). This Court has not declared a "bright line rule" for determining when adversarial proceedings have commenced in Texas, thus triggering a Sixth Amendment right to counsel. *See Green v. State*, 872 S.W.2d 717, 720 (Tex. Cr.App.1994) (finding a preliminary initial appearance is not a "critical stage," thus avoiding a determination of whether such appearance marks initiation of adversarial proceedings). Examples of actions which mark the initiation of formal adversarial proceedings include: filing an indictment, *DeBlanc v. State*, 799 S.W.2d 701 (Tex.Cr.App.1990), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2912, 115 L.Ed.2d 1075 (1991) (holding no Sixth Amendment right to counsel because defendant not yet indicted); filing an information and complaint, *McCambridge v. State*, 712 S.W.2d 499 (Tex.Cr.App.1986) (holding Sixth Amendment right to counsel did not attach until complaint and information filed); arraignment, *Michigan v. Jackson*, 475 U.S. 625, 629, 106 S.Ct. 1404, 1407, 89 L.Ed.2d 631 (1986); and an Article 15.17 "warning hearing," where arrest warrant was present, *Nehman v. State*, 721 S.W.2d 319 (Tex.Cr. App.1986). But an arrest alone does not trigger the right. *Green*, 872 S.W.2d at 720; *Garcia v. State*, 626 S.W.2d 46, 53 (Tex.Cr. App.1981) (warrant, arrest and taking of defendant before a magistrate do not meet the requirements of filing formal charges).

At the time of his line-up, no complaint or indictment had been filed against appellant. Nor had appellant been taken before a magistrate for warning pursuant to Article 15.17. It is clear that investigators were still in the process of confirming that they had arrested the actual perpetrator. Although prior precedent has not distinctly identified the point at which formal adversarial proceedings have begun, we may glean enough from the cases to say with confidence that appellant's Sixth Amendment right to counsel had not attached at the time of his line-up. The trial court did not err to admit evidence of same. Appellant's first supplemental point of error is overruled.

Because the pre-trial line-up did not violate appellant's Sixth Amendment right to counsel, appellant's second supplemental

point of error concerning the admissibility of the resulting in-court identification on the above grounds is also without merit. Even assuming, *arguendo,* that the pre-trial line-up was improper, the in-court identification would have been admissible if Bartie's ability to identify appellant had an origin independent from the pre-trial procedure. *Garcia,* 626 S.W.2d at 53; *Waller v. State,* 648 S.W.2d 308, 312 (Tex.Cr.App.1983). Bartie testified that her in-court identification of appellant was based on her "living through the robbery," not the pre-trial line-up. Supplemental point of error two is overruled.

■ In supplemental points of error four and five, appellant contends that his "Constitutional right to counsel of his choice" was violated when the trial court appointed Melamed to assist retained-counsel Benn. Appellant argues that he refused to sign the order appointing counsel and testified at the motion for new trial hearing that he did not want to sign the order without conferring with Benn. No further objections to Melamed's appointment or representation appear in the record.

■ Appellant had his counsel-of-choice in Benn.[22] He does not claim that Melamed impaired his defense in any manner nor did he object, after presumably consulting with Benn, to Melamed's representation.[23] The record shows that Benn was 72 years old at the time of trial and was prone to take afternoon naps. The record further indicates that Melamed conducted himself reasonably and provided effective counsel. Where a trial court deems, as in the instant case, that retained counsel may need assistance, it is acceptable to *sua sponte* appoint additional counsel, and does not violate a defendant's right to counsel of choice. Both the state and federal constitutions guarantee a right to effective assistance of counsel. Appointment of additional counsel in this case insured appellant that right. Supplemental points of error four and five are overruled.

### Voir Dire

■ In points of error fifteen through seventeen, appellant alleges trial error in the denying of defense counsel's challenges for cause, thereby forcing appellant to accept an objectionable juror after exercising all his peremptory strikes. However, we note that appellant failed to name an appropriate objectionable juror.

■ When the trial court errs in overruling a challenge against a venireperson, the defendant is harmed only if he uses a peremptory strike to remove the venireperson and thereafter suffers a detriment from the loss of the strike. *Demouchette v. State,* 731 S.W.2d 75, 83 (Tex.Cr.App.1986), *cert. denied,* 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987). Error is preserved only if appellant used all his peremptory strikes, asked for and was refused additional peremptory strikes, and was then forced to take an identified objectionable juror whom appellant would not otherwise have accepted had the trial court granted his challenge for cause or granted him additional peremptory strikes so that he might strike the juror. *Adanandus v. State,* 866 S.W.2d 210, 220 (Tex.Cr.App.1993), *cert. denied,* 510 U.S. 1215, 114 S.Ct. 1338, 127 L.Ed.2d 686 (1994); *Satterwhite v. State,* 858 S.W.2d 412, 415 (Tex.Cr.App.), *cert. denied,* 510 U.S. 970, 114 S.Ct. 455, 126 L.Ed.2d 387 (1993); *Demouchette,* 731 S.W.2d at 83. This process occurs in the selection of the seated panel and the alternate juror or jurors.

However, the selection of alternate jurors is treated as distinct and separate from the primary panel. *Cooks v. State,* 844 S.W.2d 697, 721 (Tex.Cr.App.1992), *cert. denied,* 509 U.S. 927, 113 S.Ct. 3048, 125 L.Ed.2d 732 (1993). Following the selection of the primary panel, the parties' unused peremptory strikes are wiped out and each party is given a designated number of strikes for use in selecting one or more alternate jurors. *Id.;*

---

22. We note that the trial court did not appoint Melamed to replace Benn. The trial court did not designate that appointed counsel would take over as first chair nor did the trial court specify to what extent Melamed should participate. These decisions were made by counsel.

23. Indeed, we find it somewhat ironic that appellant complains of Melamed's participation after his numerous complaints of Benn's alleged incompetence. *See* points of error two, three, five, six, seven, and fourteen, *ante.*

Article 35.15(d). The record reflects that appellant had used all fifteen of his peremptory strikes by the time the eleventh juror was seated. He requested and received one additional peremptory strike which he used on the following juror. He then requested another peremptory strike which the trial court denied. The next juror was accepted by both parties without objection as the twelfth juror. On appeal, appellant claims the alternate juror as his objectionable juror. However, this is improper. As stated above, the selection of the alternate is a distinct and separate process from the selection of the primary panel. *Cooks*, 844 S.W.2d at 721. Hence, appellant can claim no objectionable juror and has failed to preserve these issues for our review. *Demouchette*, 731 S.W.2d at 83. We overrule points of error fifteen through seventeen.

 In point of error twenty-seven, appellant argues that Articles 1.13 and 1.14 violate his equal protection rights under sections 10, 13, and 19 of the Texas Constitution, by granting the State the ability to challenge for cause any juror who says he would never vote for the death penalty. However, Articles 1.13 and 1.14 do not grant the State any powers or duties regarding voir dire. Article

1.13 governs the waiver of a jury trial and Article 1.14 governs the waiver of other rights in general. Appellant's complaint is without merit. Point of error twenty-seven is overruled.[24]

## Pretrial Motion

 In supplemental point of error six, appellant contends that his arrest was illegal because there was insufficient evidence to support the magistrate's finding of probable cause to issue an arrest warrant.[25] He argues that the line-up and in-court identifications must be suppressed under the "fruit of the poisonous tree" doctrine. He alleges that the affidavit for the arrest warrant was improperly based on eye-witness Bartie's "strong tentative" identification of appellant after she viewed appellant's picture in a photo spread.[26]

 An arrest warrant must provide the magistrate with "sufficient information to support an independent judgment that probable cause exists for the warrant." *Jones v. State*, 568 S.W.2d 847, 855 (Tex.Cr.App.), *cert. denied*, 439 U.S. 959, 99 S.Ct. 363, 58 L.Ed.2d 352 (1978). The warrant's affidavit need only contain probable cause, it need not

24. We note appellant's equal protection argument centers around the fact that prospective jurors in non-capital cases cannot be struck for cause due to their belief in the death penalty. However, the complained-of classification must discriminate against similarly situated individuals. *Smith v. State*, 898 S.W.2d 838, 847 (Tex.Cr. App.1995). Appellant's complaint is not among similarly situated individuals—appellant is treated the same as all capital defendants. *Id.*

Further, we note that Article 35.16(b)(1) allows the State to challenge for cause any juror who "has conscientious scruples in regard to the infliction of the punishment of death for crime, in a capital case, where the State is seeking the death penalty." The State can strike a juror for cause if she professes an inability to perform her duties as a juror and obey her oath. See *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). If a juror can never consider the possibility of a death sentence, then she cannot perform a duty required of her as a juror. The State may then strike her for cause under Art. 35.16(b)(1). See *Nichols v. State* 754 S.W.2d 185, 196 (Tex.Cr. App.1988), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 819, 102 L.Ed.2d 808 (1989).

Appellant also argues that his equal protection rights were violated because all blacks, Christians, and economically deprived people are against the death penalty and would, therefore, be struck from the jury. Appellant cites no authority for these generalizations and identifies no jurors struck from his jury for the above reasons.

25. Point of error thirty-four also contends that appellant's arrest was illegal and, therefore, the in-court identification should have been suppressed. However, a majority of the argument is inexplicably absent from appellant's brief, and we cannot identify the substance of his argument. The Court can answer the point only on what is submitted. Point of error thirty-four is overruled on the grounds that it is inadequately briefed and presents nothing for our review. Tex.R.App.Proc. 74(f).

26. Appellant cites several facts to support his position that are not listed in the affidavit. This Court, however, is constrained to look only within the four corners of the document to see if there was sufficient evidence to support the magistrate's finding of probable cause. *Jones v. State*, 568 S.W.2d 847, 855 (Tex.Cr.App.), *cert. denied*, 439 U.S. 959, 99 S.Ct. 363, 58 L.Ed.2d 352 (1978).

contain sufficient evidence that would convince a jury of the defendant's guilt beyond a reasonable doubt. *Janecka v. State,* 739 S.W.2d 813, 823 (Tex.Cr.App.1987). Further, it is well settled that, in determining the sufficiency of an affidavit for an arrest warrant, a reviewing court is limited to the "four corners of an affidavit." *Jones v. State,* 833 S.W.2d 118, 123 (Tex.Cr.App.1992), *cert. denied,* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 678 (1993); *Lagrone v. State,* 742 S.W.2d 659, 661 (Tex.Cr.App.1987), *cert. denied,* 485 U.S. 937, 108 S.Ct. 1115, 99 L.Ed.2d 276 (1988) (and cases cited therein). Finally, the affidavit is viewed in a common-sense, not hypertechnical, fashion. *Janecka,* 739 S.W.2d at 823.

The affidavit in the instant case stated in relevant part that Bartie was present at the scene of the crime, she knew the victim and the security guard, she witnessed a black male pull out a gun and hold it to the security guard's head, she saw the male shoot at the victim when he tried to run, she witnessed a second black man run past, and the first gunman yell, "get the bag, get the bag." She then saw the two men leave the scene. The affidavit continues:

> Affiant showed a photo spread containing a known photo of [appellant] and others, and Ms. Bartie made a strong tentative identification of [appellant] as the first black male who pulled a weapon and shot at Mr. Kwan on 11–15–91.

■ We hold that it was reasonable for the magistrate to find probable cause based on the statements of the eyewitness to the crime. Appellant argues insufficiency merely because the affidavit states Bartie made "a strong tentative identification." However, as stated before, the affidavit need not contain sufficient evidence that would convince a jury of the defendant's guilt beyond a reasonable doubt. *Janecka,* 739 S.W.2d at 823. The

magistrate was justified in finding probable cause to arrest appellant. The line-up and the in-court identifications, therefore, were not tainted by an illegal arrest.[27] We must ignore appellant's assertions to the contrary that are based on evidence outside the affidavit. Supplemental point of error six is overruled.

### Guilt/Innocence Phase

■ In supplemental point of error twelve, appellant alleges that the State made improper victim-impact references during opening and closing arguments.[28] Appellant made no objection on these grounds to the State's argument at trial; therefore, he has not preserved the issue of the alleged jury argument error. *See* Tex.R.App.Proc. 52(a). Supplemental point of error twelve is overruled.

### Punishment Phase

In his supplemental point twenty-two, as we understand it, appellant maintains that allowing the prosecution discretion to decide whether or not to pursue the death penalty constitutes a violation of the Legislature's power to "define crimes and the range of penalties attached to crimes." Giving prosecutors this decision, he argues, violates Articles 1.13 and 1.14.

■ Again, appellant misinterprets Articles 1.13 and 1.14 by asserting that they grant certain powers to the State. *See* point of error twenty-seven, *ante.* In any event, it is well settled that the discretion afforded the State to seek the death penalty is not unconstitutional nor does it violate the separation of powers doctrine. *Cantu v. State,* 842 S.W.2d 667, 692 (Tex.Cr.App.1992), *cert. denied,* 509 U.S. 926, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993); *Barefield v. State,* 784 S.W.2d 38, 46 (Tex.Cr.App.1989), *cert. denied,* 497 U.S. 1011, 110 S.Ct. 3256, 111

---

**27.** We further note that the in-court identification was admissible. If a witness has the ability to make an in-court identification that has an origin independent of an allegedly improper pretrial identification procedure, then the identification is admissible at trial. *Pichon v. State,* 683 S.W.2d 422, 426 (Tex.Cr.App.1984), *cert. denied,* 471 U.S. 1137, 105 S.Ct. 2680, 86 L.Ed.2d 698 (1985) (in-court identification allowed even

though defendant arrested without probable cause).

**28.** We note that of the seven record cites given us by appellant, only one was related to victim-impact. Further only two of the seven record references occurred during opening statements or jury argument.

L.Ed.2d 766 (1990). *See also Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (holding that prosecutorial discretion was not unconstitutional). Appellant raises no novel argument to persuade us to revisit these holdings. Point of error twenty-two is overruled.

 In point of error twenty-three, appellant argues that the State intentionally failed to inform him of favorable evidence at the motion for new trial hearing. He maintains that he requested the evidence in a pretrial discovery motion, and by failing to proffer it after trial, the State violated his Fourteenth Amendment right to due process. Assuming *arguendo* that appellant has preserved this issue for review, we still overrule his point of error.

During punishment, the State introduced evidence of an extraneous offense, the Wal–Mart robbery. Eppner, one of the robbery victims, identified appellant in a line-up as one of the two robbers. Eppner was unable to identify the second robber. Appellant contends that the State's failure to disclose the fact that Eppner failed to identify the second robber amounts to reversible error.

 Under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), a prosecutor has an affirmative duty to turn over material, exculpatory evidence. Impeachment evidence is included within the scope of the term "exculpatory evidence." *U.S. v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). Evidence withheld by a prosecutor is "material" if there is a reasonable probability that, had the evidence been disclosed to the defense,

the outcome of the proceeding would have been different. *Id.* at 682, 105 S.Ct. at 3383. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *Id.* Thus, a due process violation has occurred if a prosecutor: (1) fails to disclose evidence, (2) favorable to the accused, (3) which creates a probability of a different outcome. *Id.; Thomas v. State*, 841 S.W.2d 399, 404 (Tex.Cr.App.1992). Appellant meets none of these factors.

First, the prosecution did not fail to disclose. The State's file containing the information was available to appellant's trial attorneys. Both attorneys testified they reviewed the file. Next, it is questionable that this information was favorable to appellant or that it would undermine the outcome of the case. Eppner still positively identified appellant as one of the robbers. Appellant must meet all three criteria to show a failure to disclose that is egregious enough to violate his Fourteenth Amendment due process rights. He has shown none sufficiently. Point of error twenty-three is overruled.

 In points of error twenty-four and twenty-five, appellant claims that the evidence was insufficient to establish two of the unadjudicated extraneous offenses admitted at the punishment phase of trial, and therefore, they should not have been admitted into evidence. Specifically, he complains about the aggravated robbery at Wal–Mart and evidence of an attempted bank robbery. Appellant made no objection at trial to the admission of the evidence for either of the complained-of offenses on the grounds of insufficient evidence.[29] Because appellant did

29. Appellant did object regarding the attempted bank robbery, but not until **after** Sergeant John Swaim testified. Swaim discussed how he had been told by a confidential informant about a planned robbery at the Lockwood Bank. Swaim and another officer set up surveillance on the bank. Swaim spotted a vehicle that matched the description given him by the informant. Michael Clark was the driver of the car. Swaim radioed for another unit and a helicopter to assist in the surveillance. Swaim followed Clark's vehicle which moved to various locations in the bank parking lot. The helicopter unit also spotted a van that looked suspicious. Swaim was unable to identify the people in the van, other than that they were two black males. Another unit fol-

lowed the van which was determined to have been stolen. No robbery occurred. Swaim was of the opinion that the perpetrators "made" the police and abandoned the robbery. Appellant did not object to any of this testimony.

Appellant objected just prior to the testimony of Sergeant D.D. Shirley. Shirley was the officer who followed the aforementioned van and identified appellant exiting it on the driver's side. Appellant objected to Shirley testifying about any possible conclusions that may have been drawn about a possible bank robbery because no robbery actually occurred. The trial court sustained the objection and questioning was limited to what Shirley saw or heard as to anyone driving the stolen van.

not object, he has preserved nothing for our review. Tex.R.App.Proc. 52(a). Points of error twenty-four and twenty-five are overruled.

Next, in supplemental points of error twenty-seven and twenty-eight, appellant contends that the admission of evidence of unadjudicated extraneous offenses during the punishment phase violated Article 37.07 § 3(a) and the Eighth and Fourteenth Amendments to the United States Constitution. At trial, appellant specifically objected to the admission of evidence on these grounds with regards to the Wal–Mart robbery and the possession of a firearm.

■■■ Article 37.07 § 3(a) is inapplicable to capital cases. *Gentry v. State*, 770 S.W.2d 780, 792 (Tex.Cr.App.1988), *cert. denied*, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1013 (1989). The Legislature and this Court have long held that unadjudicated offenses are admissible during the punishment phase of a capital murder trial. Article 37.071; *Kemp v. State*, 846 S.W.2d 289, 307 (Tex.Cr.App.), *cert. denied*, 508 U.S. 918, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1992); *Smith v. State*, 676 S.W.2d 379, 390 (Tex.Cr.App.1984), *cert. denied*, 471 U.S. 1061, 105 S.Ct. 2173, 85 L.Ed.2d 490 (1985). Further, this Court has consistently held that admission of extraneous unadjudicated offenses does not violate an accused's constitutional rights to due process and equal protection. *Kemp*, 846 S.W.2d at 307; *Williams v. State*, 622 S.W.2d 116, 120 (Tex.Cr.App.1981), *cert. denied*, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982). Appellant raises no novel arguments to incline us to revisit these holdings.

Even if we perceive this objection to be sufficient for the purposes of this point, it was not timely made and error was not preserved. Tex. R.App.Proc. 52(a).

**30.** Appellant requested the following instructions:

A person commits an offense only if he voluntarily engages in conduct, including an act, an omission or possession. *See* TPC Section 6.01.

Therefore, if you believe from the evidence beyond a reasonable doubt that on the occasion in question the [defendant] did cause the death of Kenneth Kwan by shooting him with a gun, as alleged in the indictment, but you further believe from the evidence, or you have

Therefore, appellant's twenty-seventh and twenty-eighth points of error are overruled.

■■■ In his twenty-sixth point of error, appellant avers that "it was reversible error for the State to argue that the jury could reach their own conclusion of whether or not there was to be a robbery at the Lockwood Bank" because there was insufficient evidence to prove up a robbery. Appellant does not cite to where in the record the allegedly improper argument occurred, nor does he cite any authority in support of his argument. Therefore, we consider the point to be inadequately briefed, presenting nothing for our review. Tex.R.App.Proc. 74(f); *Robinson v. State*, 851 S.W.2d 216, 222 n. 4 (Tex.Cr.App. 1991), *cert. denied*, —— U.S. ——, 114 S.Ct. 2765, 129 L.Ed.2d 879 (1994). Point of error twenty-six is overruled.

### Jury Charge

#### 1. Guilt/Innocence

■■■ In points of error eighteen and twenty, appellant argues that the trial court erred in refusing his requested charges on voluntary conduct.[30] He argues that the evidence raised the issue that appellant's firing of the gun may have been accidental due to a struggle with the security guard. Appellant claims the requested instructions asked the jury to take the voluntariness of the shooting into account, and that the trial court had an obligation to instruct the jury on this relevant legal issue. We disagree.

a reasonable doubt thereof, that the shooting was a result of an accidental discharge of the gun while Jim Powell and the defendant were struggling or scuffling for the possession of the gun or a reaction to the movements of Jim Powell and was not the voluntary act or conduct of the defendant, you will acquit the defendant and say by your verdict "Not Guilty".

\*　　\*　　\*　　\*　　\*　　\*

Unless you believe from the evidence, or you have a reasonable doubt thereof, that the death of Kenneth Kwan was caused by the intentional, voluntary conduct of the Defendant, or that the Defendant was responsible for the conduct of another as heretofore defined, you will find the Defendant not guilty.

Section 6.01(a) of the Texas Penal Code states that a person commits an offense only if he engages in voluntary conduct, including an act, an omission, or possession. Only if the evidence raises reasonable doubt that the defendant voluntarily engaged in the conduct charged should the jury be instructed to acquit. *George v. State*, 681 S.W.2d 43, 45 (Tex.Cr.App.1984). "Voluntariness," within the meaning of section 6.01(a), refers only to one's physical bodily movements. *Alford v. State*, 866 S.W.2d 619, 624 (Tex.Cr.App.1993).

Appellant insists that the following portions of testimony raised reasonable doubt regarding the voluntariness of appellant's actions:

*Testimony of Carolyn Bartie:*

Q. [Appellant] passed Mr. Kwan, and then what happened?

A. I looked down at my purse again.

Q. What did you notice next?

A. Then I heard this noise. I looked up and he had the security guard by the neck.

Q. When you say he had the security guard, who are you talking about?

A. The man who had the bag.

Q. During this time were you able to see his face?

A. Yes.

Q. You said you heard a noise or a sound before you looked up to look and you saw him—the man that had the bag holding the security guard. Could you describe the noise?

A. It was like a popping sound.

Q. When you looked up, what was the man doing with the security guard?

A. Holding him, firing into the store.

 \* \* \* \* \* \*

Q. Had a good hold on him?

A. Yes.

Q. Where was the gun?

A. He was firing like this (indicating).

Q. When you looked up, his arm was extended and he was firing a gun?

A. Right.

 \* \* \* \* \* \*

Q. What direction did you see him firing the gun?

A. Straight into the door that was closed.

*Testimony of James L. Powell:* [31]

A. I felt a gun up side my head.

Q. And this gun that was up side your head, was it touching your face or head?

A. It was to my head.

Q. Don't be embarrassed. What did that person say to you that had the gun up there?

A. "Drop the gun. Drop the gun." Excuse my language. He said, "If you don't, I'll blow your God-damned brains out."

Q. Did you believe him?

A. I throwed [sic] the gun down.

Q. ... So, you took the shotgun you had—are you saying you just threw it to the ground?

A. Yes, sir.

Q. Didn't have to argue with him or anything like that?

A. No.

Q. You knew he had the drop on you.

A. That's right.

Q. At that time, did he come into any kind of physical contact with you? Did he touch you in any place or grab you in any way?

A. I felt the gun. I don't remember if he grabbed me or what. I think he had his hand on my shoulder, I think. I'm not sure.

Q. You knew you were in no position to argue with him?

A. That's right.

At no time does the record raise any evidence that appellant's conduct was not voluntary. We find no evidence that a struggle over the gun occurred between appellant and Powell. *See Adanandus*, 866 S.W.2d at 230. Because appellant raises no evidence to show that he did not voluntarily engage in the conduct charged, the trial court did not err in

---

**31.** Appellant cited this Court to a very limited portion of Powell's testimony. Additional testimony has been added because it was deemed helpful in our review.

refusing appellant's requested instructions. Appellant's eighteenth and twentieth points of error are overruled.

In point of error nineteen, appellant maintains that the trial court erred by denying his requested instruction regarding accomplice-witness testimony. Specifically, appellant claims that Craig Burks, appellant's nephew, was an accomplice as a matter of law and, therefore, the trial court was required to give the requested instruction. An accomplice witness is one who participates with a defendant before, during, or after the commission of a crime. *Kunkle v. State*, 771 S.W.2d 435, 439 (Tex.Cr.App.1986), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3259, 106 L.Ed.2d 604 (1989). The participation must involve some form of an affirmative act committed by the witness to promote the commission of that offense. *Id.* at 441. In order to be an accomplice as a matter of law, the witness must be susceptible to prosecution for the offense with which the accused is charged. *Id.* at 439.

Appellant claims that Burks is an accomplice as a matter of law because: (1) Burks was taken to the crime scene two weeks before the offense by Mike Clark; (2) Burks admitted he used to steal cars for Clark; (3) Burks was a suspect in the case when he called Crime Stoppers; and (4) Burks was drinking beer bought from the proceeds of the robbery. We first note that Burks was never indicted for the instant offense. Also, there is no evidence that Burks was ever a suspect in the case.[32] A witness is not an accomplice witness merely because he may have known of the offense and did not disclose it or even concealed it. *Kunkle*, 771 S.W.2d at 439. Furthermore, complicity with an accused in the commission of another offense does not make that witness an accomplice in the offense for which the accused is on trial if there is no showing of the witness' complicity in that particular offense. *Id.* There is no evidence that Burks made any affirmative act to promote the commission of the crime either before, during, or after the offense. Therefore,

Burks was not an accomplice as a matter of law or fact. *Id.* at 438–41. The trial court did not err in failing to submit appellant's requested instruction. Point of error nineteen is overruled.

In supplemental point of error seven, appellant complains that the trial court's instruction under § 7.02(b) of the Texas Penal Code enlarged the indictment to include the offense of conspiracy, therefore permitting the jury to convict appellant without the required *mens rea*. In supplemental point of error eight, he contends that the § 7.02(b) instruction violated the Eighth and Fourteenth Amendments because it automatically imputed an intent to kill based on his alleged membership in a conspiracy.

The jury was instructed in the abstract portion of the charge under both §§ 7.02(a) and (b) as follows:

All persons are parties to an offense who are guilty of acting together in the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

Mere presence alone will not constitute one a party to an offense.

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

However, the application portion of the charge provided:

---

32. Appellant's assertion is based on a question by appellant during cross examination in which appellant asked Burks if he knew that he was a suspect when he contacted the police. Burks replied that he did not. There is nothing in the record to show that in fact he *was*.

Now if you find from the evidence beyond a reasonable doubt that on or about the 15th day of November, 1991, in Harris County, Texas, the [defendant], did then and there unlawfully while in the course of committing or attempting to commit the aggravated robbery of Kenneth Kwan, intentionally cause the death of [Kwan], by shooting [him] with a deadly weapon, namely, a firearm; or if you find from the evidence beyond a reasonable doubt that on or about the [above date], Albert Harris and/or Michael Clark and/or Marty did then and there unlawfully while in the course of committing or attempting to commit the aggravated robbery of [Kwan], intentionally cause the death of [Kwan] with a deadly weapon, namely, a firearm, and that the [defendant], *with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid* Albert Harris and/or Michael Clark and/or Marty to commit the offense, if he did, then you will find the defendant guilty of capital murder as charged in the indictment.

(Emphasis added.) The trial court did not charge the jury on the § 7.02(b) conspiracy theory in the application paragraph.

▪▪▪ The application paragraph of a jury charge is that which authorizes conviction, and an abstract charge on a theory of law which is not applied to the facts is insufficient to bring that theory before the jury. *Jones v. State,* 815 S.W.2d 667, 669 (Tex.Cr. App.1991). Where the application paragraph

refers to the law of parties described in the abstract portion of the charge, the jury is authorized to convict upon a parties theory. *Johnson v. State,* 739 S.W.2d 299, 305 n. 4 (Tex.Cr.App.1987). It is error to refer to the law of parties in the abstract portion of the charge and not to apply the law or to refer to that law in the application paragraph of the jury charge. *Id.* at 303–05; *Romo v. State,* 568 S.W.2d 298, 303 (Tex.Cr.App.1977) (opinion on rehearing). However, the error is not reversible unless there is a timely and sufficient objection to the charge or a specially requested charge is timely filed. *Romo,* 568 S.W.2d at 303.

In the instant case, appellant did not object to the inclusion of the § 7.02(b) instruction in the abstract portion of the charge, but instead requested an instruction to include the conspiracy theory in the application paragraph.[33] This does not conform with appellant's complaint on appeal.[34] Tex.R.App. Proc. 52(a). Supplemental points of error seven and eight are overruled.[35]

▪▪▪ In supplemental point of error eleven, appellant maintains that the trial court erred by refusing to submit his special requested instruction on concurrent causation under Texas Penal Code § 6.04(a).[36] Appellant argues that the evidence made it possible to infer that, if he in fact shot at Kwan, his shots were not fatal and that the fatal shots came from another gunman. Appellant misinterprets the law and the facts.

---

33. Appellant requested the following charge:

Under the law applicable to this case, in order to find [the defendant], guilty of capital murder, you must believe beyond a reasonable doubt that:
1. He specifically intended to cause the death the Kenneth Kwan; AND
2. EITHER he actually did cause the death of [Kwan] OR was criminally responsible for his death as a party as heretofore defined. AND
3. Such killing was in furtherance of the robbery or attempted robbery. AND
4. Such killing was part of the common design and intent of all conspirators, including [defendant], and not the result of another acting independently of [defendant].

34. Appellant could have objected to the inclusion of the language from § 7.02(b) in the abstract

portion of the charge. In such a case, the trial court should remove the unnecessary language. But appellant made no such objection here.

35. Appellant further argues that the instruction was required because the State mentioned a conspiracy during closing arguments. However, appellant did not object to this portion of the State's argument; therefore, any error was waived. Tex.R.App.Proc. 52(a).

36. Appellant requested the following instruction:

A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

An accused may be exonerated under Texas Penal Code § 6.04(a) only if the concurrent cause was clearly sufficient, operating alone, to produce the result *and* the accused's conduct alone was clearly insufficient to do so. *Felder v. State*, 848 S.W.2d 85, 90 n. 1 (Tex.Cr.App.1992), *cert. denied*, 510 U.S. 829, 114 S.Ct. 95, 126 L.Ed.2d 62 (1993). The record shows: Appellant's nephew testified that appellant admitted to shooting Kwan.[37] Bartie witnessed appellant, who was behind Powell, fire a gun at Kwan as he was running into the store. Powell, the security guard, testified that two shots were fired from behind him and Davis, a customer, only saw the accomplice shoot twice at Kwan. The medical examiner testified that at least three of the bullets found in Kwan were fatal. Because the evidence shows that appellant and his accomplice each fired two shots, and, according to the medical examiner, three of the bullets were fatal, appellant must have fired at least one fatal shot. From all the evidence it appears appellant's conduct was not clearly insufficient to cause Kwan's death. Under the terms of the statute, appellant was not entitled to an instruction on concurrent causation. *Id.; see also Dowden v. State*, 758 S.W.2d 264, 272–73 (Tex.Cr.App. 1988). Supplemental point of error eleven is overruled.

### *2. Punishment*

In supplemental point of error nine, appellant contends that the trial court erred by refusing to submit the anti-parties charge he requested. In his tenth supplemental point of error, he claims that the second statutory special issue, Article 37.071 § 2(b)(2), is facially unconstitutional under the reasoning of *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

Appellant requested the following charge:

You are instructed that in arriving at your answers to the special issues in this punishment phase of trial, which are contained in these written instructions, you must not consider the instructions given you in the first phase of trial—that is, the guilt-innocence phase of trial—that relate to the law of parties and the responsibility of parties for the acts of others in the commission of offenses. In this punishment phase of trial, only the conduct of [appellant], and no other in the commission of the offense on trial, shall be considered by you in the [sic] determining what his punishment shall be.

The trial court refused this instruction, but charged the jury in compliance with Article 37.071 § 2(b)(2):

Do you find from the evidence beyond a reasonable doubt that [appellant], *the defendant himself,* actually caused the death of Kenneth Kwan, the deceased, on the occasion in question, or if he did not actually cause Kenneth Kwan's death, that he intended to kill Kenneth Kwan or another, or that he anticipated that a human life would be taken?

(Emphasis added). Under the prior version of Article 37.071,[38] appellant would have been entitled to the requested charge. However, the absence of a prophylactic anti-parties charge has not generally been considered egregious error or harm. *Nichols v. State*, 754 S.W.2d 185, 199 (Tex.Cr.App.1988), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 819, 102 L.Ed.2d 808 (1989).[39] Under the new statute, the jury is instructed specifically to consider the defendant's behavior alone. Article

---

**37.** Appellant's nephew later testified that appellant said that it was another gunman that shot Kwan.

**38.** The previous version of Article 37.071 is now codified under Article 37.0711 and applies to offenses .occurring before September 1, 1991. The special issues under Article 37.0711 § 3(b) state:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

No anti-parties charge was included.

**39.** Overruled on other grounds by *Green v. State*, 764 S.W.2d 242 (1989), and *Harris v. State*, 784 S.W.2d 5 (1989).

37.071 § 2(b)(2) ("the defendant himself"). We hold that this adequately serves the same purpose.

In reviewing the constitutionality of the statute, we must view it *as applied* to appellant only. *Dinkins v. State*, 894 S.W.2d 330, 340 (Tex.Cr.App.), *cert. denied*, —— U.S. ——, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995); *McBride v. State*, 862 S.W.2d 600, 610–11 (Tex.Cr.App.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2765, 129 L.Ed.2d 879 (1994). Appellant argues that the phrase "or that he anticipated that a human life would be taken" renders Article 37.071 § 2(b)(2) unconstitutional because the phrase lacks the required culpability. In support of his argument, appellant cites this Court to *Tison* and *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

Both *Tison* and *Enmund* were concerned with the implementation of the death penalty on defendants who were not proven to have an intent to kill. At guilt/innocence, the jury was specifically charged that they could not find appellant guilty of capital murder unless he intentionally murdered Kwan or intentionally assisted in the commission of the robbery *and* murder. *See Webb v. State*, 760 S.W.2d 263, 268 (Tex.Cr.App.1988), *cert. denied*, 491 U.S. 910, 109 S.Ct. 3202, 105 L.Ed.2d 709 (1989); *Tucker v. State*, 771 S.W.2d 523, 530 (Tex.Cr.App.1988), *cert. denied*, 492 U.S. 912, 109 S.Ct. 3230, 106 L.Ed.2d 578 (1989); *see also* supplemental points of error seven and eight, *ante*. The jury found appellant to be guilty. Having previously held the evidence was sufficient to support the jury's verdict, *see* point of error one, *ante*, we also hold *Tison* and *Enmund* are satisfied. *Webb*, 760 S.W.2d at 268; *Tucker*, 771 S.W.2d at 530. For purposes of the Eighth Amendment, at least, there was no need for further factfinding at the punishment phase of trial. Any facial unconstitutionality inhering in Article 37.071 § 2(b)(2)

did not affect appellant. Supplemental points of error nine and ten are overruled.

Appellant's thirteenth supplemental contention is based upon the trial court's failure to respond in open court to questions from the jury during deliberations. He specifically claims that the trial court did not comply with the "mandatory" requirements of Article 36.27. The pertinent portions of Article 36.27 state:

> Any communication relative to the cause must be written, prepared by the foreman and shall be submitted to the court through the bailiff. The court shall answer any such communication in writing, and before giving such answer to the jury shall use reasonable diligence to secure the presence of the defendant and his counsel, and shall first submit the question and also submit his answer to the same to the defendant or his counsel for objections and exceptions, in the same manner as any other written instructions are submitted to such counsel, before the court gives such answer to the jury, but if he is unable to secure the presence of the defendant and his counsel, then he shall proceed to answer the same as he deems proper. The written instruction or answer to the communication shall be read in open court unless expressly waived by the defendant.
>
> All such proceedings in felony cases shall be a part of the record and recorded by the court reporter.

Appellant's argument on appeal centers on the jury's request for a definition of "society."[40] The trial court simply answered, "No." No objection was lodged to this answer. Appellant argues that by refusing to define the term, the trial court in effect gave the jurors an additional instruction. We disagree.

Where communication between the jury and the court does not amount to additional instructions, noncompliance with the

---

40. The other juror questions consisted of requests for beverages, phone calls, noise reduction, and testimony. The first three are obvious requests for personal comfort and convenience and are unrelated to the law of the case. The court's response regarding the testimony was to give the jurors a form explaining that testimony may not be given to them unless the jurors disagree and how to go about requesting such testimony. The jurors did not return any of the forms. Therefore, no testimony was given to them. Where communication between the jury and the court does not amount to additional instructions, noncompliance with the provisions of Article 36.27 is not reversible error. *Nacol v. State*, 590 S.W.2d 481, 486 (Tex.Cr.App.1979).

provisions of Article 36.27 is not reversible error. *Nacol v. State,* 590 S.W.2d 481, 486 (Tex.Cr.App.1979) (jury instructed "You are only to consider what is contained in the charge."); *Gillett v. State,* 663 S.W.2d 480, 481 (Tex.App.—Corpus Christi 1983) (jury instructed only to follow the charge); *Phillips v. State,* 654 S.W.2d 846, 848 (Tex.App.—Dallas 1983) (jury instructed it is its duty to follow the charge). We consider this case analogous to a response telling the jury simply to follow the charge that was given. In the instant case, no additional instructions were given as to the law in regard to the offense or the facts. No error occurred. Supplemental point of error thirteen is overruled.

In supplemental point of error fourteen, appellant avers that Article 37.071's definition of "mitigating evidence" is unconstitutional because it limits the Eighth Amendment concept of "mitigation" to factors that render a capital defendant less morally blameworthy for the commission of the offense.[41] He specifically claims that the definition is too narrow because it does not include evidence relevant to "a defendant's character, history, or circumstances of the crime that militates in favor of a life sentence."

First, we note that appellant made no objection to the definition at trial. Therefore, he failed to preserve error. Tex.R.App. Proc. 52(a). Further, in the abstract portion of the charge, a "mitigating circumstance" is defined as including, "but is not limited to, any aspect of the defendant's character, background, record, emotional instability, intelligence or circumstances of the crime which you believe could make a death sentence inappropriate in this case." Thus, appellant's point is moot; even if the statute is deficient in the way he suggests, he did not suffer the deficiency. Supplemental point of error fourteen is overruled.

In supplemental point of error nineteen, appellant contends that the special issue regarding mitigating evidence, Article 37.071 § 2(e), is facially unconstitutional because it does not expressly assign a burden of proof.[42] We disagree.

Appellant first argues that the trial court failed to instruct that the burden to prove aggravating factors was on the State. However, we note that the burden to prove the aggravating factors under Article 37.071 § 2(b) is explicitly on the State. Article 37.071 § 2(c). But, appellant argues, the State should shoulder the burden of proving aggravating factors under Article 37.071 § 2(e). But the special issue under § 2(e) does not involve consideration of aggravating factors. The necessary narrowing function has already been taken care of under § 2(b). Thus, there is no burden of proof as to aggravation to assign at the § 2(e) stage of the proceedings. This argument is without merit.

Next, appellant complains that the burden to prove mitigating factors is, by the language of Article 37.071 § 2(e), impliedly on the defense. To the extent this might be regarded as a complaint that the Eighth Amendment forbids placing the burden on the defendant, we have rejected it elsewhere. In *Barnes v. State* we observed:

> The Eighth and Fourteenth Amendments do not require that a burden be placed on the State. In a plurality opinion, the United States Supreme Court in *Walton v. Arizona* affirmatively declined to "adopt as a constitutional imperative a rule that would require the court to consider the mitigating circumstances claimed by a defendant unless the State negated them by a preponderance of the evidence." 497 U.S. 639, at 650, 110 S.Ct. 3047, at 3055, 111 L.Ed.2d 511, at 526 (1990) (plurality opinion). The plurality in *Walton* further held that it is not unconstitutional to place

---

**41.** Article 37.071 § 2(f)(4) states that the jury shall be charged that in answering the [third special issue], the jury:

shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

**42.** Appellant claims that the statute fails to assign a burden of proof on both the aggravating and mitigating circumstances. Appellant is mistaken. Article 37.071 § 2(c) expressly pronounces that the State shall have the burden to prove the "aggravating" circumstances under Article 37.071 § 2(b) (future dangerousness and "anti-parties" charges).

a burden on the defendant to establish sufficient mitigating circumstances by a preponderance of the evidence. *Id.* [497] U.S. at 649–651, [110] S.Ct. at 3055–56, 111 L.Ed.2d at 525–27.

*Id.*, 876 S.W.2d at 330.

It is true that the Legislature has not explicitly assigned a burden of proof under Article 37.071 § 2(e). Other than the above complaints, however, appellant does not make clear how he thinks this perceived deficiency renders our capital punishment scheme unconstitutional on its face. We will not fashion his arguments for him. Tex. R.App.Proc., Rule 74(f). Appellant's nineteenth supplemental point of error is overruled.

■ Appellant's twenty-second supplemental point of error argues that the punishment charge violated his constitutional rights in that the jury was instructed that unless at least ten jurors collectively agreed that one or more of the special issues should be answered in appellant's favor, a life sentence would not be imposed. He contends the instructions mandated by Article 37.071 §§ 2(b) and 2(f) [43] violate the Eighth and Fourteenth Amendments because there is a reasonable possibility that all twelve jurors may believe that a life sentence is appropriate, but because ten jurors can't agree as to any one special issue,[44] the jury could not return a life sentence. Therefore, he argues that such a "majority rules" mentality could lead jurors to change their potential "life" votes to a vote for the death penalty. In supplemental point of error twenty-three, he further claims that it was unconstitutional not to instruct the jury that a life sentence would be automatically imposed if even one

juror "holds out." Article 37.071 § 2(g). Appellant's complaints are without merit.

■ First, this Court has previously held that, with regard to the Article 37.071 § 2(b) special issues, the instruction given does not constitutionally mislead the jurors into thinking that an affirmative answer should be given unless ten or more jurors agree to give a negative one. *Draughon v. State,* 831 S.W.2d 331, 337–38 (Tex.Cr.App. 1992), *cert. denied,* 509 U.S. 926, 113 S.Ct. 3045, 125 L.Ed.2d 730 (1993). We see no reason that this logic should not also apply to the mitigation issue. Further, there is no constitutional inhibition to concealing from jurors the consequences of their deliberations, so long as they are not misled into believing that ultimate responsibility for the verdict rests elsewhere. *Id.; Arnold v. State,* 873 S.W.2d 27, 37–38 (Tex.Cr.App. 1993), *cert. denied,* — U.S. ——, 115 S.Ct. 103, 130 L.Ed.2d 51 (1994); *Cantu,* 842 S.W.2d at 692–93. Second, in addition to the statutory instructions, the jury was charged as follows after each special issue:

> In the event the jury is unable to agree upon an answer to Special Issue No. [1, 2, or 3] under the conditions and instructions outlined above, the Foreman will not sign either form of answer to the Special Issue.

In appellant's "Special Requested Punishment Charge # 2," he requested the above instruction.[45] Because the jury was instructed not to answer a special issue if a unanimous affirmative answer or a ten-juror negative answer could not be reached, the jury was given an avenue to accommodate the complained-of potential disagreements. Therefore, appellant's contention is without merit. Accordingly, appellant's supplemental

---

43. Article 37.071 §§ 2(d) and 2(f) state:
 The court shall charge the jury that in answering the issue submitted under Subsection [2(b) or 2(e)] of this article, the jury:
 (1) shall answer the issue "yes" or "no";
 (2) may not answer the issue ["no" under 2(b) or "yes" under 2(e)] unless it agrees unanimously and may not answer the issue ["yes" under 2(b) or "no" under 2(e)] unless 10 or more jurors agree; ....

44. Appellant argues, for example, that if eight jurors believed that he was not a future danger and four did believe he was, then the jurors

would have to answer the first special issue affirmatively because ten jurors could not agree to the negative.

45. Appellant further requested that the jury be instructed: "Should the jury be unable to agree upon an answer to any special issue, the Defendant will be assessed a life sentence." In point of error twenty-one, appellant maintains that the trial court erred in refusing this instruction. However, appellant's request was appropriately denied. *See Draughon; Arnold; Cantu, supra.* Point of error twenty-one is overruled.

points of error twenty-two and twenty-three are overruled.

In his supplemental points of error twenty and twenty-one, appellant alleges that capital punishment is cruel and unusual under the Eighth and Fourteenth Amendments to the United States Constitution and Article I, § 13 of the Texas Constitution. Specifically, appellant seems to argue that the scheme is *per se* unconstitutional because the consideration of mitigating evidence required under *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), contradicts or places into paradox, the "structured discretion" in sentencing required by *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).[46]

The United States Supreme Court has often recognized the dichotomous commandments of the Eighth Amendment: "the eligibility decision and the selection decision." *Tuilaepa v. California*, 512 U.S. 967, ——, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994). To be "eligible" for the death penalty, it is required that the trier of fact be able to convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. *Id.; see also Romano v. Oklahoma*, 512 U.S. 1, ——, 114 S.Ct. 2004, 2009, 129 L.Ed.2d 1 (1994) (States must establish a threshold below which the death penalty cannot be imposed). A State must establish "rational criteria that narrow the decisionmaker's judgment as to whether a particular defendant's case meets the threshold." *McCleskey v. Kemp*, 481 U.S. 279, 305, 107 S.Ct. 1756, 1774, 95 L.Ed.2d 262 (1987). In Texas, the aggravating factor is contained in the definition of the crime and in our requirement at punishment that the jury find the defendant to be a continuing threat to society. V.T.C.A. Penal Code, § 19.03 (jury must find murder accompanied by one of eight enumerated factors); Article 37.071 § 2(b)(1); *Jurek v. Texas*, 428 U.S. 262, 269, 96 S.Ct. 2950, 2955, 49 L.Ed.2d 929 (1976) (scheme upheld as constitutional).

Appellant's complaint concerning our "open-ended" *Penry* mitigation issue concerns not the "eligibility" requirement, but the "selection" decision. "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235 (1983). That requirement is met when the jury is able to consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime. *Tuilaepa*, 512 U.S. at ——, 114 S.Ct. at 2635; *Johnson v. Texas*, 509 U.S. 350, ——, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993). Unlike the eligibility decision, which fits the crime within a defined classification, the selection decision, "requires individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability." *Tuilaepa*, 512 U.S. at ——, 114 S.Ct. at 2635.

We note that the Court in *Penry* specifically denied that its holding signaled a return to unbridled jury discretion, reasoning that as long as the class of murderers subject to capital punishment is narrowed, a procedure allowing a jury to recommend mercy based on mitigating evidence introduced by a defendant raises no constitutional infirmity. 492 U.S. at 327, 109 S.Ct. at 2951. The inclusion of the mitigation issue in the present Texas scheme is merely a codification of the dictates of *Penry*. While the open-ended selection determination can appear to be at some tension with the narrow eligibility decision, *see Walton v. Arizona*, 497 U.S. at 656–74, 110 S.Ct. at 3058–68 (Scalia, J., concurring), our statute properly narrows the eligibility decision during the guilt phase while permitting the jury a broad reviewing ability at punishment to determine a defendant's culpability. Our broad selection determination does not violate the Eighth Amendment. Supplemental point of error twenty is overruled.

---

46. Appellant uses two sources as authority for making his Eighth Amendment argument: (1) Justice Blackmun's *dissenting* argument in the denial of certiorari of the Texas capital case *Callins v. Collins*, 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994), and (2) Justice Thomas' *concurring* opinion in *Graham v. Collins*, 506 U.S. 461, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993).

■ Appellant further remarks that this Court has said that it can and should interpret the Texas Constitution in a more expansive manner than the federal constitution and cites us to several cases for this proposition. *See Heitman v. State*, 815 S.W.2d 681 (Tex. Cr.App.1991). He then notes that the Texas Constitution proscribes "cruel *or* unusual punishments" while the Eighth Amendment prohibits "cruel *and* unusual punishments." Without further substantive citation or authority, he claims that this is the reason we should hold his present claim meritorious. We consider this point inadequately briefed, presenting nothing for our review. Tex. R.App.Proc. 74(f); *Robinson*, 851 S.W.2d at 222 n. 4. Supplemental point of error twenty-one is overruled.

■ In a similar argument, appellant's twenty-sixth supplemental point of error alleges that Article 37.071 § 2(e) violates the Eighth Amendment.[47] Appellant asserts that article 37.071 § 2(e) creates an open-ended and unstructured capital sentencing instruction. We note that appellant does not cite this Court to any majority opinion in support of his argument.

In *Penry* the Supreme Court held that Article 37.071 was unconstitutional *as applied* because the statute failed to provide the jury with a vehicle to give effect to the mitigating evidence. *Penry*, 492 U.S. at 328, 109 S.Ct. at 2949, 106 L.Ed.2d at 284. The Court instructed that in instances where mitigating evidence was presented, all that is constitutionally required is a vehicle by which the jury is able to consider and give effect to the mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime. *Id.; see also Johnson v. Texas*, 509 U.S. at 363–64, 113 S.Ct. at 2667. In Texas, this vehicle commonly took the form of a jury nullification instruction or a fourth special issue. *See Fuller v. State*, 829 S.W.2d 191, 209 (Tex.Cr.App.1992), *cert. denied*, 508 U.S. 941, 113 S.Ct. 2418, 124

L.Ed.2d 640 (1993) (jury nullification charge); *State v. McPherson*, 851 S.W.2d 846, 847–50 (Tex.Cr.App.1992), *cert. denied*, 508 U.S. 939, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993) (fourth special issue). The Supreme Court has not seen fit to overrule *Penry* or its progeny.

In 1991, in order to comply with *Penry*, the Texas Legislature revised Article 37.071.[48] The new statute is applicable to all offenses occurring on or after September 1, 1991. *See* Tex.S.B. 880, Sec. 5, 72nd Leg., R.S. (1991) V.T.S.L.S. Chapter 838. The instant offense occurred on November 15, 1991. Appellant was charged under the new statute. Because Article 37.071 § 2(e) is a codification of the *Penry* requirements and appellant was tried appropriately under this new special issue, his complaint is without merit. Supplemental point of error twenty-six is overruled.

■ In supplemental points of error twenty-four and twenty-five, appellant maintains that the Texas death penalty has been arbitrarily imposed and is unconstitutional because of the different capital sentencing schemes that have been in effect since 1989. He specifically states that the Texas death penalty is unconstitutional under the Eighth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and Article 1 §§ 13 and 19 of the Texas Constitution.

This Court has held:

[I]t is incumbent upon the defendant to show that in its operation the statute is unconstitutional as to him in his situation; that it may be unconstitutional as to others is not sufficient.

*Santikos v. State*, 836 S.W.2d 631, 633 (Tex. Cr.App.), *cert. denied*, 506 U.S. 999, 113 S.Ct. 600, 121 L.Ed.2d 537 (1992); *see also James v. State*, 772 S.W.2d 84, 91 (Tex.Cr.App.), *vacated on other grounds*, 493 U.S. 885, 110 S.Ct. 225, 107 L.Ed.2d 178 (1989). Appellant was tried under the 1992 version of Article

---

47. "Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, is there a sufficient mitigating circumstance or circumstances to warrant that a sentence of life

imprisonment rather than a death sentence be imposed?"

48. The previous version of Article 37.071 is now codified under Article 37.0711 and applies to offenses occurring before September 1, 1991.

37.071[49] which we have held elsewhere in this opinion to be constitutional. *See* supplemental points of error twenty, twenty-one, and twenty-six, *ante.* Because appellant has simply made a global argument as to all capital defendants since 1989, and has not shown how his specific rights were violated by application of the statute, his contentions are without merit. Supplemental points of error twenty-four and twenty-five are overruled.

Supplemental points of error thirty-one and thirty-two complain about the "anti-sympathy" instruction given by the trial court at punishment.[50] Specifically, in the latter, appellant contends that the instruction violates the Eighth Amendment. In the former, he argues that the giving of the instruction violates the Separation of Powers Clause of the Texas Constitution. *See* Tex. Const. Art. II. § 1.

We have already addressed the validity of this charge with regards to the Eighth Amendment. *Wheatfall v. State,* 882 S.W.2d 829, 842 (Tex.Cr.App.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 742, 130 L.Ed.2d 644 (1995). Appellant raises no novel argument to persuade us to revisit this holding. We therefore overrule his thirty-second point of error.

■■■ With regard to appellant's separation of powers contention, we note that the United States Supreme Court has intimated that an anti-sympathy instruction may be, not just permitted, but actually required under the Eighth Amendment. In *Saffle v. Parks,* 494 U.S. 484, 490, 110 S.Ct. 1257, 1261, 108 L.Ed.2d 415 (1990), the Supreme Court observed:

> It is no doubt constitutionally permissible, *if not constitutionally required,* for the State to insist that the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence. Whether a juror feels sympathy

for a capital defendant is more likely to depend on that juror's own emotions than on the actual evidence regarding the crime and the defendant. It would be very difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities with our longstanding recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary.

*Id.,* 494 U.S. at 492–93, 110 S.Ct. at 1262–63 (emphasis added). If, in fact, the Eighth Amendment actually mandates an anti-sympathy instruction, this Court would have no choice but to accept it, notwithstanding our own state doctrine of separation of powers, under the Supremacy Clause of the United States Constitution. *Cf. State v. McPherson, supra* at 850 (under Supremacy Clause a *Penry* instruction required though arguably not authorized under Article 37.07 § 1(a), which mandates a general verdict).

■■■ Assuming an anti-sympathy instruction is not *required* under the Eighth Amendment, appellant asserts that the instruction violated separation of powers because the trial court had no statutory authority under which to give it. We disagree. Article 36.14 requires that the trial court, "before the argument begins, deliver to the jury, ... a written charge distinctly setting forth the law applicable to the case[.]" As appellant acknowledges, this Court has held that an emotional plea from a relative that a capital defendant's life be spared is objectionable evidence, because it "does not pertain to appellant's background, character, or record, or the circumstances of the offense[.]" *Fuller v. State,* 827 S.W.2d 919, 935–36 (Tex.Cr. App.1992). This signals as a matter of state law that any purely emotional appeal has no relevance to the jury's assessment of "the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant[.]" Article 37.071, § 2(e). *See California v. Brown,* 479 U.S. 538, at 543, 107 S.Ct. 837, at 840, 93

---

**49.** *This version is applicable to crimes committed on or after September 1, 1991.*

**50.** The trial court submitted the following instruction:

You are further instructed that you are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling in considering all the evidence before you in answering the special issues.

L.Ed.2d 934, at 941 (1987) ("An instruction prohibiting juries from basing their sentencing decisions on factors not presented at trial, and irrelevant to the issues at the trial, does not violate the United States Constitution."). It has long been a feature of our law that in their deliberations jurors are not to consider matters outside the record. *E.g.*, *Trevino v. State*, 582 S.W.2d 111 (Tex.Cr.App.1979); Tex.R.App.Proc. 30(b)(7). Surely the irrelevance of "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" to the jury's assessment of mitigating evidence at the punishment phase of a capital murder trial is a component of "the law applicable to the case" for purposes of instructing the jury under Article 36.14. Indeed, as we have pointed out, such an instruction may even be mandated by the Eighth Amendment. We hold that it did not violate separation of powers for the trial court to give it. Appellant's supplemental point of error thirty-one is overruled.

█ In points of error twenty-eight through thirty-three[51] and supplemental point of error thirty-three, appellant contends that the trial court erred by refusing his requests to instruct the jury on the meaning of a life sentence and his eligibility for parole. Specifically, he argues that his due process rights were violated under both the United States and Texas Constitutions,[52] and that his rights were also violated under the Eighth Amendment.

51. Appellant's thirtieth and thirty-first points of error complain that his equal protection rights were violated under both the Texas and United States Constitutions. However, appellant fails to cite to any portion of either constitution as to where these rights are provided and, furthermore, fails to make an equal protection argument. His argument again centers on due process. Because appellant's points of error are inadequately briefed, we overrule them. Tex.R.App.Proc. 74(f).

52. Again, appellant fails to cite to any provision in the Texas Constitution. Further, he makes no argument explaining how this Court should override the Texas constitutional provision that prohibits the jury's consideration of parole in a capital case without further legislative action. Tex. Const. art 4, § 11(a) (legislature shall have authority to enact laws that permit courts to inform juries about parole); *Smith*, 898 S.W.2d. at 849; *Elliott v. State*, 858 S.W.2d 478, 489 n. 7

We have already resolved this issue against appellant. *Smith*, 898 S.W.2d at 846–53, and cases cited therein; *Willingham v. State*, 897 S.W.2d 351, 358–59 (Tex.Cr.App. 1995). Because appellant produced no evidence showing why the evidence of parole would be mitigating in the instant case[53] and he raises no argument to persuade us to revisit our previous holding, *see Smith*, 898 S.W.2d at 849 n. 16, we overrule appellant's twenty-eighth through thirty-third points of error and thirty-third supplemental point of error.

In his thirty-fourth supplemental point of error, appellant contends the trial court reversibly erred when it charged the jury at punishment as follows on parole:

> During your deliberations, you are not to consider or discuss any possible action of the Board of Pardons and Paroles division of the Texas Department of Criminal Justice or of the Governor, or how long the defendant would be required to serve to satisfy a sentence of life imprisonment.

Appellant's contention is without merit. Because we have held that the matter of parole or an inmate's release thereon is not a proper consideration for the jury's deliberations at punishment, *ante*, the trial judge's instruction was a correct statement of the law. This Court has held that the giving of such an instruction is not reversible error. *Ramirez v. State*, 815 S.W.2d 636, 653 (Tex.Cr.App. 1991); *Williams v. State*, 668 S.W.2d 692, 701

(Tex.Cr.App.), *cert. denied*, 510 U.S. 997, 114 S.Ct. 563, 126 L.Ed.2d 463 (1993). All arguments pertaining to the Texas Constitution are overruled.

53. Appellant's mitigating evidence consisted of the following: (1) a prison guard testified that appellant had no disciplinary problems during the eight months that appellant awaited his trial for capital murder; (2) a former employer testified that appellant was a good and dependable worker; and (3) appellant's wife testified that he was a good husband and she believed he was innocent. Appellant makes no argument as to how this evidence in combination with the parole information would tend to show that he would not "commit criminal acts of violence that would pose a continuing threat to society," either in prison or out. *Smith*, 898 S.W.2d at 857–60, 864 (Clinton, J., dissenting); *Willingham*, 897 S.W.2d at 359 (Clinton, J., concurring).

(Tex.Cr.App.1983), *cert. denied,* 466 U.S. 954, 104 S.Ct. 2161, 80 L.Ed.2d 545 (1984). Appellant's thirty-fourth supplemental point of error is overruled.

■■■■ Finally, appellant's thirty-fifth supplemental point of error complains that the trial court violated his Eighth Amendment right to a jury instruction on an operative legal term when it failed to define "society" and "continuing threat to society" in the charge. However, this Court has previously held that a trial court does not err in refusing to define these terms. *Felder,* 848 S.W.2d at 100–01 (society); *Fearance v. State,* 771 S.W.2d 486, 513 (Tex.Cr.App.1988), *cert. denied,* 492 U.S. 927, 109 S.Ct. 3266, 106 L.Ed.2d 611 (1989) (continuing threat to society). Appellant's thirty-fifth supplemental point of error is overruled.

Finding no reversible error, we affirm the judgment of the trial court.

MALONEY, J., concurs on points 6, 16 and 17, otherwise joins.

KELLER, Judge, concurring.

I write separately with regard to supplemental points of error sixteen and seventeen to dispel the notion that the failure to conduct a sufficiency review of the mitigation special issue (Article 37.071 § 2(e)[1]) is somehow inconsistent with the language of Article 44.251. The latter provision states in relevant part:

> The court of criminal appeals shall reform a sentence of death to a sentence of confinement in the institutional division of the Texas Department of Criminal Justice for life if the court finds that there is insufficient evidence to support an affirmative answer to an issue submitted to the jury under Section 2(b), Article 37.071, or Section 3(b), Article 37.0711, of this code *or a negative answer to an issue submitted to a jury under Section 2(e), Article 37.071, or Section 3(e), Article 37.0711, of this code.*

Art. 44.251(a) (emphasis added).

The plain language of this provision requires reformation of a death sentence to life

*if* this Court conducts a sufficiency review and finds the evidence to be insufficient. The wording of the statute does not require that a sufficiency review be conducted. This conclusion is supported by the fact that the other subsections of Article 44.251 all relate to this Court's power to reform death sentences but do not relate to a review of the sufficiency of the evidence. *See* Art. 44.251(b) & (c).

Further, before the passage of the original version of this provision, this Court did not have the power to reform a death sentence to life imprisonment and was required to remand the case for a new trial. *Ocker v. State,* 477 S.W.2d 288, 290 (Tex.Crim.App. 1972). *Harris v. State,* 485 S.W.2d 284 (Tex. Crim.App.1972). *Bogany v. State,* 661 S.W.2d 957, 959 (Tex.Crim.App.1983) (Teague, J. concurring). We held that limited authorization to make such reformations was conferred when the legislature enacted Article 44.251. *Sorola v. State,* 693 S.W.2d 417, 419 (Tex.Crim.App.1985), *cert. denied,* 493 U.S. 1005, 110 S.Ct. 569, 107 L.Ed.2d 563 (1989).

Legislative history further supports the view that Article 44.251 does not require a sufficiency review but merely prescribes the remedy in the event such a review is conducted. Senator Glasgow, on the floor of the Senate before passage, noted that, under the then-current law, if this Court found the evidence to be insufficient to support an affirmative finding on the punishment issues, then the case had to be retried all over again. H.B. 1164, Sen. Glasgow, Senate Floor, June 30, 1981. Glasgow stated that the purpose of the bill was to permit this Court to reform the sentence to life instead of starting all over. Id. Representative McFarland made similar comments on the floor of the House of Representatives. H.B. 1164, Rep. McFarland, House Floor, Second Reading, April 14, 1981.

Before the effective date of the 1991 amendment that inserted the emphasized language regarding mitigation into Article

---

**1.** All references to Articles are to the Texas Code of Criminal Procedure unless otherwise provid- ed.

44.251, Judge Clinton noted that, if this Court overturned a judgment based upon a sufficiency review of mitigating evidence, we would not have the power to reform the judgment to a life sentence. *Ex Parte Goodman*, 816 S.W.2d 383, 388 n. * (Tex.Crim. App.1991) (Clinton, J. concurring). An appropriate interpretation of the 1991 amendment is that the Legislature simply did not want to leave a loophole in the statute in the event that this Court or the United States Supreme Court decided that the mitigation issue was subject to a sufficiency review.

The fact that this interpretation may leave the provision without practical effect under current law is of no concern. As the majority opinion explains, the statutory mitigation issue is merely a codification of *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). In reacting to the Supreme Court's decision, the legislature may not have had an opinion as to whether a sufficiency review was appropriate. Or, it may have believed that there was some possibility that the courts would decide that such a review was constitutionally required. Because Article 44.251 is merely a *remedy* statute regarding this Court's power to reform a death sentence to life imprisonment, one should not infer from it a mandate by the legislature to conduct a sufficiency review where such intent is not clearly found elsewhere.

To the extent that the majority holds or implies that the language of Art. 44.251 indicates that a sufficiency review of mitigating evidence should be conducted, I disagree. In all other respects, I join the majority opinion.

McCORMICK, P.J., and WHITE, J., join.

BAIRD, Judge, dissenting.

In his sixth point of error, appellant contends he was denied effective assistance of counsel because his attorney, John Benn, slept during trial. *See,* Appellant's Brief, pp. 43–45. The State contends Benn's sleeping did not affect the outcome of the trial because appellant was represented by two attorneys. *See,* State's Brief, pp. 50–51. The Majority agrees with the State, holding appellant "failed to show that he was preju-

diced to the extent that the result of his trial would have been different...." *Ante,* 928 S.W.2d at 505. For the following reasons, I respectfully dissent.

### I.

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court adopted a two-step analysis to review claims of ineffective assistance of counsel. The appellate court must first determine whether trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. If so, the appellate court must then determine whether there is a reasonable probability the result of the trial would have been different but for counsel's deficient representation. A reasonable probability is nothing more than a "probability sufficient to undermine the confidence in the outcome." *Id.,* 466 U.S. at 694, 104 S.Ct. at 2064. *See, Ex parte Menchaca*, 854 S.W.2d 128, 131 (Tex.Cr.App.1993); *and, Boyd v. State*, 811 S.W.2d 105, 109 (Tex.Cr.App.1991).

The Supreme Court has recognized situations where prejudice should be presumed once trial counsel's deficient representation is shown. *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067 ("In certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice."). In *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the Supreme Court stated:

> ... *There are ... circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.* Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. *Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that*

*makes the adversary process itself presumptively unreliable.*[1]

*Id.,* 466 U.S. at 658–659, 104 S.Ct. at 2046–2047. Appellant contends the instant case is one where prejudice should be presumed.

## II.

After his arrest, appellant retained the services of John Benn, an attorney for forty-two years. However, while in a holding cell, appellant was visited by Sandy Melamed who stated he was going to be appellant's attorney. When Melamed asked appellant to "sign some papers," appellant refused and asked to speak to Benn. The transcript includes a Request for Appointment of Counsel and Order of Court. Although the request purports to have been sworn to before a Harris County deputy district clerk, appellant did not execute this request. Instead, there appears a notation that appellant refused to sign the Request for Appointment of Counsel. In spite of this the trial judge found appellant "executed an affidavit stating he is without counsel and is too poor to employ counsel...." The trial judge appointed Melamed to represent appellant.[2]

Both attorneys understood Benn was to be lead counsel. After his appointment, Melamed contacted Benn to determine "if he wanted to have a discussion about who would do what." However, Benn wanted no such discussion. According to Benn, the attorneys' joint preparation for trial was "three or four hours."[3] As the trial began, Benn indicated after the State's examination of each witness whether he wished to cross-examine that witness. If not, Melamed handled the cross-examination. The attorneys did not discuss the witnesses' examinations.

Benn testified his preparation for appellant's trial consisted of "reading the State's case and briefing a few points of law on evidence." Benn could not remember the number of times he visited appellant, but believes it was fewer than five.[4] Benn prepared no motions, made no request for the issuance of subpoenas, and did not seek to talk to any witnesses, nor did he contact any of the co-defendants in appellant's extraneous offenses.

Because of the circumstances in which he was appointed, and because of Benn's unwillingness to discuss the case with him, Melamed testified he felt he had to be prepared "to do everything." However, Melamed further testified he felt constrained to obtain an agreement from Benn and appellant on any decision. Melamed testified his preparation for appellant's trial consisted of a seven hour review of the State's files, visiting appellant once in the Harris County Jail, and conferring with appellant on the telephone and during trial. Melamed attempted to contact a list of witnesses provided by appellant but was not successful.[5] Melamed prepared and filed several motions in appellant's behalf and made a request to have a subpoena issued for several witnesses but did not speak to any of the State's witnesses or the co-defendants in appellant's extraneous offenses.

Finally, the uncontroverted evidence before us establishes that Benn slept during appellant's trial. Appellant and Melamed testified Benn slept. Indeed, Benn testified:

Q. Do you have an illness that has caused you to sleep?

A. I'm 72 years old. I customarily take a short nap in the afternoon.

Q. Did you inform your client that you had to take a nap during the afternoon?

A. No, I did not. I had capable co-counsel all the time with me.

---

1. All emphasis is supplied unless otherwise indicated.

2. The trial judge did not explain his appointment of Melamed over appellant's refusal. However, the State argued this appointment occurred "by the Court's caution in making sure [Benn] had an additional attorney to assist him in light of his age."

3. Melamed testified he and Benn did not discuss the case "very often."

4. Appellant testified Benn visited him once at the Harris County Jail and once in the courtroom holding cell.

5. The trial judge appointed an investigator to assist Melamed, but the investigator was not asked to locate these witnesses.

Melamed testified that as Benn slept at trial, he thought perhaps the jury would feel sorry for appellant.

### III.

I find the majority's suggestion that it was somehow reasonable trial strategy for appellant's lead counsel to take a "short nap" during trial utterly ridiculous. *Ante,* 928 S.W.2d at 505, n. 20. The possibility of jury sympathy can never be a reasonable alternative to effective representation. A sleeping counsel is unprepared to present evidence, to cross-examine witnesses, and to present any coordinated effort to evaluate evidence and present a defense. In my view, a sleeping attorney is no attorney at all.[6] *See, Javor v. United States,* 724 F.2d 831, 833 (9th Cir. 1984) ("When an attorney ... sleeps through a substantial portion of the trial, such conduct is inherently prejudicial....") In such situations prejudice should be presumed. *See, Cronic, supra.*

Even if prejudice could not be presumed in this case, I believe appellant satisfied his burden under *Strickland.* There can be no doubt that Benn's representation fell below any objective standard of reasonableness. And I believe the representation appellant received in this case was sufficient to "undermine the confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2064.

The Supreme Court has recognized the importance of an attorney to the trial process:

> ... Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment was good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he may have a perfect one. He

requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he may not be guilty, he faces the danger of conviction because he does not know how to establish his innocence.

*Gideon v. Wainwright,* 372 U.S. 335, 345, 83 S.Ct. 792, 797, 9 L.Ed.2d 799 (1963). Thus, as the *Gideon* Court recognized, the assistance of counsel is essential to the fair administration of justice. The trial judge had so little confidence in Benn's ability to represent appellant that Melamed was appointed to assist Benn. But Benn remained the lead attorney. And considering the lack of communication between Benn and Melamed, the lack of preparation for trial, and the uncontroverted evidence of Benn's sleeping, I have no confidence in the hand that guided appellant's representation. *Ibid.* Stated differently, I have no confidence that appellant was represented by counsel with adequate skill or knowledge to prepare his defenses, if any, and to prevent his conviction upon incompetent or irrelevant evidence.

In my view, Melamed's presence did not excuse or rehabilitate Benn's incompetent representation. Melamed's preparation for this trial consisted of only a seven hour review of the State's files. He visited appellant once before trial and prepared some pre-trial motions. Such preparation cannot be what the Sixth Amendment contemplates for a capital murder trial where the death penalty is possible. Neither attorney interviewed a witness and neither attorney reviewed the extraneous offenses that were to be later admitted. Benn decided which witnesses he would cross-examine and he informed Melamed of his decision only after the State's examination. Thus, Melamed's preparation for cross-examination of his witnesses could not have been effective because he did not know which witnesses he was to question. And considering the role to which he was relegated, Melamed was in no position to put forth a coordinated defense strategy. Even more disturbing, Benn could sleep during the direct examination and still elect to conduct

---

**6.** This view was expressed in *Ex parte Burdine,* 901 S.W.2d 456, 457–458 (Tex.Cr.App.1995)

(Maloney, Baird and Overstreet, JJ., dissenting).

cross-examination. It seems to me that Melamed's belief the jury might feel sympathy for appellant was more a desperate hope than reasonable trial strategy.[7]

### IV.

I believe appellant has established that he received ineffective assistance of counsel and is entitled to a new trial. *See, Cronic, supra; and, Strickland, supra.* However, because the majority holds a defendant may receive effective representation from slumbering counsel, I respectfully dissent.

OVERSTREET, J., joins this opinion.

---

7. I focus on Benn's representation of appellant because Benn was the lead counsel. But even assuming it is possible that second counsel's representation may somehow allay the harm caused by the lead counsel's sleeping, such is not the case here. Clearly the circumstances in the instant case, such as Benn's refusal to discuss the case and his continued control over the case, prevented Melamed from assuming control and insuring competent representation.